## No. 8831.

### LINDSEY v. THE PEOPLE.

1. CONTEMPT—*Definition.* Contempt which disrespects the court, or obstructs the administration of justice, is a criminal contempt. A witness refusing without sufficient cause or excuse to testify in a cause pending in a court of justice, is guilty of a criminal contempt.*

2. ——*Process.* When a contempt is committed in the presence of the court summary punishment may be inflicted without formal accusation or process.

3. ——*Justification.* Upon the trial of a woman for the murder of her husband, a son of the two, twelve years of age, testified in favor of his mother. The defendant who was then the judge of the Juvenile Court, being called for the people, to contradict the child, admitted having interviews with the boy, but refused to disclose the statements made by the child claiming that they were privileged. Answering a citation for his contempt, subsequently issued, he stated that the child, upon his promise that whatever the child said should be regarded as confidential, confessed that his mother, and not himself, committed the homicide; and defendant sought to justify his refusal to testify, under the general rule, independent of statute, (Wig. Ev., sec. 2285), upon the ground that immediately upon his confession, the child became delinquent, and under the provisions of the statute, a ward of the Juvenile Court, and he, the defendant, immediately stood *inloco parentis,* without any proceedings whatsoever in that court, and he, the sole judge of whether the interest of the child or public justice, required the disclosure of the child's communication.

These Contentions, and the interpretation placed by defendant upon the statute were rejected, and the conviction for contempt affirmed.

4. DELINQUENT CHILD—*Proceedings Against.* The proceedings against a delinquent child must comply with the statute (Laws 1909 c. 156). Until the proceeding prescribed by the statute is initiated, and the matter regularly presented for hearing, the Juvenile Court has no jurisdiction of the child.

*Syllabus by Burke, J.

*Error to Denver District Court, Hon. John A. Perry, Judge.*

*En banc.*

Mr. O. N. HILTON and Mr. C. A. ROBERTS, attorneys for plaintiff in error.

Hon. LESLIE E. HUBBARD, Attorney General, and Mr. BERTRAM B. BESHOAR, for the people.

FROM a judgment of the court below imposing a fine upon plaintiff in error (who is and at all times hereinafter mentioned was judge of the Juvenile Court of the City and

County of Denver) for contempt of court in refusing to testify, he prosecutes this writ.

The case of *The People v. Bertha Wright* was on trial in the criminal division of the District Court of the City and County of Denver. The defendant in that case was being prosecuted on the charge that she had murdered her husband, John A. Wright. In the course of the trial Neal Wright, the twelve-year-old son of Bertha Wright, was called as a witness and testified in her behalf. Thereupon the prosecution called the plaintiff in error for the purpose of discrediting the said Neal Wright by showing that he had made admissions to plaintiff in error contrary to his sworn testimony. Counsel for the defendant, Bertha Wright, first objected, on her behalf, to the plaintiff in error testifying at all, on the ground that any statement made to him by Neal Wright was made in confidence. The objection was overruled. Plaintiff in error thereupon testified, in substance, that he first met Neal Wright early in May, when he came to plaintiff's chambers in company with a friend to discuss matters connected with the murder case; that he again saw Neal Wright at the latter's home about May 18, and had a further talk with him on the same subject; that thereafter, on the same day and in the same place, he had a conference with said Neal Wright, at which no third person was present. Plaintiff was then asked the following question: "During that time that you had him separate and apart from the others, state whether or not he told you that at the time his father was shot, on the 13th day of April, 1915, at this same house, his mother was standing with the gun, holding it with both her hands as she fired the shot, and that Neal was then standing in the doorway of the folding doors between the parlor and the hall, or in substance that?" to which question plaintiff replied: "That, if your honor please, brings me into a conversation that I had in confidence with this boy, and I will not state whether I did or did not, or anything he said to me, and I would like to give my reasons why I consider it

a privileged communication." Plaintiff further stated that
the communications made by the boy to him at the time in
question were "indirectly" in a case pending before him;
that such a case was *now* pending; that at the time the
communications were made he anticipated there would be
such a case; that he did not think there was a case pending,
but that he considered "a child becomes a ward of the state
when an offense is committed;" that the communication in
question was in absolute confidence. Assured by the Dis-
trict Attorney that when Neal Wright was on the witness
stand he had consented to plaintiff's answering this ques-
tion, plaintiff replied: "I contend that he has no right to
weigh what I wish to do." The court thereupon ruled
plaintiff to answer, and he refused. Warned by the trial
judge that he was disobeying an order of court, he an-
swered: "I differ with your honor on the law." Again
ordered to answer the question, he again refused expressly
upon the ground that the communication thus called for was
privileged. Thereupon a petition for a citation in contempt
was prepared and filed by the District Attorney by order
of court; the citation was issued and respondent moved to
strike certain portions thereof. This motion was sustained
in part and denied in part. Thereupon, an oral motion was
made to dismiss the petition for want of sufficient facts,
which motion was overruled. Plaintiff in error then an-
swered, to which answer a demurrer was filed and sus-
tained. An amended answer was filed, and a motion to
make the same more specific, which motion was sustained,
and an amendment to the said amended answer filed. The
District Attorney thereupon filed a motion to strike this
amendment from the files as evasive, not responsive, incon-
sistent with facts theretofore specifically pleaded by plain-
tiff in error, and inconsistent with his sworn testimony, and
for judgment on the pleadings. This motion was sustained
and judgment entered imposing a fine upon plaintiff in error
for "willful, deliberate and gross contempt."

The answer, amended answer and amendment to the

amended answer of plaintiff in error are largely statements
of conclusions of law and arguments thereon.  Aside from
such, these pleadings set forth the following facts:

Early in May, 1915, Neal Wright came to the chambers
of plaintiff in error, in company with a friend, and in the
presence of both stated that he fired the shot which killed
his father.  May 15, 1915, plaintiff in error went to the
home of Neal Wright, where, in the presence of other per-
sons, said Neal Wright repeated in detail this statement.
On the suggestion of plaintiff in error, he then held a con-
ference with the boy apart from the others.  This confer-
ence was had by the consent of his mother, Bertha Wright,
her friends and her attorney, and upon the assurance that
whatever was said would be accepted as confidential.  In
that conference he assured Neal Wright that whatever he
then said could not be used against him, and could not be
used in any court against his mother.  During the confer-
ence Neal Wright once or twice said, "They couldn't make
you testify as to what I am telling you, could they?" and
was each time assured that they could not.  In addition to
the foregoing, the amendment to the amended answer re-
cites, in substance, that on the 18th day of April, 1915, Neal
Wright said to the plaintiff in error, "I killed my father.
He beat up my mother and I made up my mind that sooner
or later I would have to lay him out."  That thereupon he
was taken in charge as a delinquent child, and proceedings
were instituted (no date is given) against said Neal Wright,
and from that date he was declared a delinquent child; that
such proceedings have ever since been pending and are
still pending (at the time of the filing of the pleading)
against the said Neal Wright, and appear upon the docket
of said Juvenile Court for trial as of the 14th day of Octo-
ber, 1915; "that at the date mentioned, under and by virtue
of the law of Colorado designed to protect delinquents from
publicity, pending investigation in the case, no proceedings
were entered of record, but that the same remained in the
breast of this respondent, as chancellor, and were pending

without number and date, under the rules and policy of said Juvenile Court, and are now pending, by number and date, as by the records of said court, ready to be produced, will more fully appear."

Mr. Justice Burke delivered the opinion of the court:

Plaintiff in error contends that he has been denied due process of law. A contempt committed in the immediate presence of the court while sitting as such is a direct contempt. 13 Corpus Juris 5. A contempt which disrespects the court or obstructs the administration of justice is a *criminal* contempt. *Wyatt v. People*, 17 Colo. 252-258, 28 Pac. 961, citing Rapalje on Contempts, Sec. 21. Where the contempt is in the immediate presence of the court, summary punishment may be inflicted without affidavit, notice, rule to show cause, or other process. 13 Corpus Juris 63.

If plaintiff in error in this case was guilty of contempt, it was a direct criminal contempt. It interfered with the due course of the trial and the administration of justice, and might have, and may have, resulted in a gross miscarriage of justice. It could have been punished summarily. Instead, the trial judge directed the filing of a petition for citation, as to the sufficiency of which respondent was heard. He was permitted to file an answer, which was held insufficient. He was permitted to file an amended answer, which, failing to comply with the ruling of the court, he was given leave to make more specific. His amendment to the amended answer was stricken, and judgment entered on the pleadings. His claim of denial of due process of law could not have been upheld had he been punished summarily. He was thrice given an opportunity to present a defense, and, by the ruling of the trial court, he thrice failed. Unless the communication called for was privileged, the judgment must stand.

The claim of privilege made by plaintiff in error is based primarily upon three contentions:

*First:* That the communication was privileged, under the general rule concerning such communications, irrespective of any statute.

Assuming, but not deciding, that communications other than those specifically mentioned in any statute on the subject may be now held privileged, the general rule is well laid down in Wigmore on Evidence, Section 2285, as follows:

"1.    The communications must originate in a *confidence* that they will not be disclosed.

2.    This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

3.    The *relation* must be one which, in the opinion of the community, ought to be sedulously *fostered,* and

4.    The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of the litigation."

Considering the importance of the case on trial to the defendant as well as the people, and the rare instances in which courts are likely to be confronted with a similar situation, it appears to us beyond question that the benefit to be gained by the correct disposal of the litigation was so infinitely greater than any injury which could possibly inure to the relation by the disclosure of the communication, that the requirements of the fourth section of the rule were not met, and the rule is inapplicable.

*Second:* Plaintiff in error contends that the communication was privileged by reason of the provisions of certain sections of the Juvenile law of Colorado. The only sections relied upon and which seem to require any consideration are sections 586, 1590 and 1607 of the Revised Statutes of Colorado, 1908; section 1, chapter 199, page 478, Laws of 1909; chapter 51, page 152, Laws of 1913, and chapter 156, page 334, Laws of 1909, amending section 586, Revised Statutes, 1908. From these sections plaintiff in error draws the following conclusions: That the instant an offense was committed by Neal Wright, plaintiff became *in loco parentis* during the child's minority; that the moment Neal Wright

told him he killed his father, the child became a ward of the Juvenile Court; that his jurisdiction attached without any proceedings being entered of record; that such proceedings, until so entered of record, remained in the breast of respondent and were pending without number or date; that he alone could decide when Neal Wright was within the jurisdiction of the Juvenile Court; that he was the sole judge as to whether the interests of the public or the interests of the child, or its parents, or public justice, would suffer by his disclosing the communication in question.

Said section 586 provides that a "delinquent child" shall include any child 16 years of age or under who violates any law of this state; that "any child committing any of the acts herein mentioned shall be deemed a juvenile delinquent person and shall be proceeded against as such in the manner hereinafter provided;" that "a disposition of any child under this act, or any evidence given in such cause, shall not in any civil, criminal or other cause or proceeding whatever, in any court, be lawful or proper evidence against such child for any purpose whatever, excepting in subsequent cases against the same child under this act."

Said section 1590 provides that the Juvenile Court "shall have original jurisdiction in all criminal cases, or other actions or proceedings in which the disposition, custody or control of any child or minor * * * may be involved under the acts concerning delinquent, dependent or neglected children, * * * or which may in any manner concern or relate to the person, liberty, protection, correction, morality, control * * * of any infant child or minor, * * *.

Said section 1607 vests the power and authority to exercise jurisdiction over minors under the acts concerning delinquent children, "or which may in any manner concern or relate to the person, liberty, protection, correction, morality, control, adoption or disposition" of any such child in the juvenile courts created by the act of which this section is a part.

Section 1, chapter 199, Laws of 1909, provides that that act "shall be construed to be an effort of the state, under its police powers and in its character of *parens patriae* to care for and provide for the protection of the morals and well-being of its citizens, and, where practicable, to avoid proceedings tending to degrade, and, under the provisions of the act, to endeavor to redeem to good citizenship persons drifting into crime * * * . This act shall only apply to cases of persons whose acts or offenses in a criminal proceeding would constitute a misdemeanor."

Chapter 51, section 1, page 152, Laws of 1913, provides that "in any case in any court against any person for the violation of any statute against rape, or of the contributory delinquency or dependency law, or any other law of this state for the correction or protection of children, it shall be unlawful for any person to print or publish in any daily or weekly newspaper, magazine, or other periodical, the picture or name of any child who may be involved therein or called as a witness."

Section 4 of the same act provides that "in any such case mentioned in section 1 of this act, the court may, in the interest of public morals and for the protection of children, enter an order forbidding the publishing of all, or any part, of the proceedings in such case, and a violation of such order shall be deemed contempt of court."

That section 586 is applicable because the moment an offense was committed, or presumed to be committed, by Neal Wright, he that moment was "deemed a juvenile delinquent person," and for that reason the jurisdiction of the Juvenile Court attached instantaneously, is an absurdity.

Section 1786, Revised Statutes 1908. provides that any person who commits any offense therein defined "shall be deemed a bunco steerer."

Section 1787, that any person who commits any offense therein defined "shall be deemed a confidence man."

Section 1788, that any person who commits any offense therein defined "shall be deemed a fakir."

Many other statutes use similar language. The District Courts of the state are given jurisdiction of these offenses, but it will not be contended that as soon as any such offense is committed the court or judge may, without complaint or information, take personal charge of the supposed offender. No more can the Juvenile judge in cases of presumed juvenile delinquency. To do so would be a gross violation of the rights of childhood, and an outrage upon parenthood. In case of the violation of any of the criminal laws above mentioned, the supposed offender must be proceeded against as provided by law; and juvenile delinquents must be proceeded against "in the manner hereinafter (in the statutes) provided." This proceeding is defined by section 3, chapter 156, page 334, Laws of 1909, as follows: "All proceedings under this act shall be by written petition * * * . The petition shall be verified * * * . Upon the filing of such petition, * * * the judge or clerk of said court shall issue a notice, which may be in the form of a citation or summons, * * * which shall be served upon one or both such parents, or guardian, * * * requiring them to appear * * * and show cause, if any, why said child should not be declared by the court to be a delinquent child * * * . In case it shall appear * * * the court may thereupon proceed to the examination and hearing provided for, and determine its delinquency * * * ."

We search this section in vain for any authorization of instantaneous jurisdiction or proceedings pending in the breast of the judge. It clearly appears from an examination of these statutes that at the time the communication in question was made to plaintiff in error, there was no case pending against Neal Wright, and the Juvenile Court had no jurisdiction over him. For the reasons given, the further provisions of section 586 prohibiting the giving of evidence in such juvenile delinquency cases against the de-

linquent or any witness in the case in any other court or proceeding, have no application. This portion of the section contemplates a case pending, and a hearing thereon, and prohibits the giving of the evidence taken in such hearing "against such child." There was no case pending against Neal Wright; there was no hearing upon any such case; the evidence sought from plaintiff in error had not been given in any such case, and it was not sought to be introduced *against* Neal Wright in any sense of the word as used in this act.

It is perfectly clear that under section 1590 the Juvenile Court would have jurisdiction when such a case was pending, and that it would have jurisdiction under the provisions of section 1607. That section 1, chapter 199, page 478, laws of 1909, has no application, is so apparent from its wording that it is unnecessary to more than point out that it applies only to misdemeanors. If Neal Wright committed any offense, or was charged with any offense, which gave the Juvenile Court jurisdiction over him, that offense certainly was not a misdemeanor.

That chapter 51, Laws of 1913, has no application is equally apparent. Section 1 thereof is solely a prohibition upon the publishers of newspapers, magazines and periodicals. Section 4 of this same act authorizes the Juvenile Court to enter an order prohibiting the publishing of all or any of the proceedings in cases therein mentioned, but as no such proceedings were pending in the Juvenile Court in the instant case, and no claim is made that any such order had been entered, it is wholly inapplicable.

It follows that the privilege claimed cannot be sustained under any of the provisions of the Juvenile law of Colorado.

*Third*: Plaintiff in error contends that the communication in question was privileged by reason of the provisions of paragraph 5, section 7274, Revised Statutes of Colorado, 1908. This paragraph reads as follows: "A public officer shall not be examined as to communications made to him in official confidence, when the public interests, in the judg-

ment of the court, would suffer by the disclosure." The entire argument upon this contention is based upon the theory that in construing this section the court must absolutely strike out of it the words "in the judgment of the court." Such a construction is indispensable to the application of the paragraph to the claim of privilege now made by plaintiff in error. Otherwise, the judgment of the court has been exercised against the claim, and the paragraph affords no protection. Every decision on the question of the disclosure by public officials of communications made to them in official confidence, not taking into consideration this language of our statute, must be disregarded. The act itself makes the trial court the sole judge as to when the public interests would suffer by the disclosure. When a public officer is called upon on the witness stand to disclose such communications, his opinion that such disclosure is improper, and the reasons therefor, are matters to be presented to the court and are for the determination of the court—not the witness. If there are exceptions to this statute, they are only such as fall within those stated by Stephens' Evidence, Article 112, page 163: "The executive of the nation, or of a state, and cabinet officers, (and perhaps others failing in the same general class) are entitled, in the exercise of their discretion, to determine how far in a judicial injiury they will produce papers or answer questions as to public affairs."

In addition to the foregoing, it is argued that a judge of a court of record ought not only to be exempted but prohibited from testifying. There is no such law in this state. It is argued that communications of the nature of those here in question partake of the character of confidential communications between attorney and client, and are therefore privileged. The contrary is true in Colorado, for the very good reason that judges generally are prohibited from acting in any such capacity, and section 1595 expressly prohibits the Judge of the Juvenile Court from acting "as attorney or counsellor at law."

The rule which excludes a Judge from testifying in a case on trial before him, and the cases cited in support thereof, have no application.

An interesting argument is presented in favor of the claim of privilege based upon the supposed powers and duties conferred by the State, in its capacity of *parens patriae,* upon plaintiff in error, and his assumed position *in loco parentis.* There is no law to support this argument and the privilege claimed by it is one which is denied a natural parent.

If the privilege existed at all, it existed for the protection of Neal Wright,—not for the benefit of plaintiff in error, or the defendant, Bertha Wright. So far as it could be said to exist for the benefit of the State a waiver was tendered by the State's representative charged with the prosecution of cases of juvenile delinquency, the District Attorney, and that waiver was admitted by the State's judicial officer, the trial judge. It was a privilege which had to be claimed by Neal Wright or some one for him. If it could be claimed by him it could be waived by him and he had expressly waived it. It has been said that the proper person to claim or waive the privilege as to a minor is the natural guardian of such minor,—in this case his mother. *State v. Depoister,* 21 Nev. 107; 25 Pac. 1000. Bertha Wright sat in court with her counsel at the time of the trial and attempted to claim the *privilege as a defendant,* which was clearly not her right. She made no attempt to make the claim *as natural guardian* of her son, and by her silence she waived it.

Much is said of the unique position of the Juvenile Court, of the vital interest of the State in the unhampered exercise of its functions, of the powers and duties of its judge, and his influence for good over wayward children, all of which meets with our unqualified approval; and, viewing the instant case apart from the important issue involved in the case of the *People v. Bertha Wright,* apart from the general rule, and all statutory enactments touching privi-

leged communications, these very considerations demand an affirmance of this judgment in the interest of Neal Wright. He had charged himself with the murder of his father; that charge had been disclosed and made public. If, in the communication in question, he had reaffirmed his guilt of that crime no possible reason existed for not disclosing it. If, on the other hand, he denied it, and admitted that he was making a false confession to shield his mother, a disclosure of such admission would be for his benefit as tending to remove from his life that frightful blot. In the one case it could not possibly do harm to reveal what already was public; in the other a failure to reveal would do incalculable harm to the very child in whose behalf the privilege was ostensibly invoked, sending him across life's threshold branded as a parricide.

For the reasons herein given the judgment is affirmed.

Bailey, J., Scott, J., and Allen, J., dissent.

Mr. Justice Bailey dissenting.

I cannot bring myself to assent to the reasoning advanced or the conclusion reached in the majority opinion for the affirmance of the judgment in this case. Seldom if ever does a dissenting opinion serve a useful purpose, it being at best only the opinion of one or more of the individual judges, in which the public has or can have but little intimate interest as against the opinion of a majority of the Court. The matter herein involved is, however, so highly important and of such wide and general concern that I regard it a duty to give expression to the views for permanent record of the judges not in accord with the ones announced in the majority opinion.

The case is before us on writ of error to review a judgment of $500.00, assessed as for contempt of court. As judge of the Juvenile Court of the City and County of Denver plaintiff in error, defendant below, had an interview at his chambers with a boy about twelve years old, in reference to the killing of the latter's father which occurred just prior to such interview. In the following month the

mother of the boy was put upon trial charged with homicide.    At the trial the son testified in her behalf.    In an attempt to impeach his testimony defendant was called by the state, and questioned in regard to the above mentioned interview.    The judge declined to disclose any matter communicated to him by the boy on the ground that it was given him in confidence as judge of the Juvenile Court, and was therefore privileged.    For such refusal the fine above indicated was imposed.

Several reasons are urged why such communications should be classed as privileged, but in our opinion only one is entitled to consideration.    This is the claim that the judge of the juvenile court, standing as *parens patriae* to those within its jurisdiction, is protected by the law from divulging anything communicated to him in confidence, as such judge.    The question for consideration is one of first impression.    Neither party has cited an authority directly in point, nor have we been able to find one, and must therefore rely upon those which appear to be analogous in principle.

It may be admitted that courts as a rule have not been disposed to recognize claims of privilege when interposed by witnesses to escape answering questions on the stand, except where it is clear that they are entitled to be so held.    The tendency is to limit such privilege, rather than to extend it.    The result is that relations which at one time made communications privileged between the parties are no longer recognized as having that effect.    There no doubt are, however, circumstances and conditions which do and should attach to certain communications of that characteristic.    The general principles governing such communications are laid down and discussed in Wigmore on Evidence, section 2285, as follows:

"Looking back at the principle of Privilege, as an exception to the general liability of every person to give testimony to all facts inquired of in a court of justice, and having in view that preponderance of extrinsic policy which

alone can justify the recognition of any such exception, * * * four fundamental conditions may be predicated as necessary to the establishment of a privilege against the disclosure of communications between persons standing in a given relation. (1) The communications must originate in a confidence that they will not be disclosed: (2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties; (3) The relation must be one which in the opinion of the community ought to be sedulously fostered; and (4) The injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation. These four conditions being present, a privilege should be recognized, and not otherwise."

The mere reliance upon the fact that a communication was made in consequence of some confidential or official relation will not in and of itself alone make such communication privileged. This is but one of four essentials. That particular condition undoubtedly was present relative to the communication under consideration. To determine the presence of the second condition, to-wit: that the element of confidentiality must be essential to the maintenance of the relation of the parties, we need only to refer to the statute creating juvenile courts. Chapter 158, Laws 1909, in defining the powers and duties of Juvenile Courts, in cases of juvenile delinquency, begins as follows:

"Section 1. In all cases of dependent children, and in cases of delinquent children who are, as defined by section 12 of the act concerning delinquent children, to be treated not as criminals, but as needing aid, assistance, encouragement, help and education, and therefore where practicable to be tried under the chancery rather than the criminal jurisdiction of the court, as wards of the State * * *"

The jurisdiction thus conferred in general terms is that of the English Court of Chancery. 16 Cyc. 28. This jurisdiction, so far as it applies herein, is discussed in 10 R. C. L. 340, as follows:

"Equity has full and complete control over the persons and property of infants, and all other persons laboring under legal disabilities, as idiots, lunatics and married women. The jurisdiction in these cases is plenary, and potent to reach and afford relief in every case where it may be necessary to preserve their estates and protect their interests. While the source of this jurisdiction is admittedly involved in some uncertainty, the doctrine now commonly maintained is that it represents a delegation to the chancellor by the crown of its rights as *parens patriae* to interfere in particular cases for the benefit of such as were incapable of protecting themselves, that it belonged to the court of chancery and was exercised by it from its establishment, and that the jurisdiction exists in the United States by inheritance from the English courts of chancery, and not because equitable rights or titles are involved, while this is indeed a special exercise of equity jurisprudence, it is beyond question that by virtue thereof purely personal rights are frequently protected. This the protection of infants from their own parents is a well established exercise of equity jurisprudence for the protection of personal rights."

The relationship thus created between the parties is in the nature of that of guardian and ward, or parent and child, but without limitations of law, and is brought about by legal process for the purpose of aiding and uplifting delinquent and wayward children, in an effort to make them assets to the State rather than liabilities. This is a humane field of boundless possibilities for good, in which plainly the element of confidentiality between the judge of the juvenile court and such children is essential to the success of the enterprise.

The last two essentials referred to by Wigmore, *supra,* namely, that the relationship should be one which in the opinion of the community should be sedulously fostered, and where the injury to accrue by disclosure is likely to be greater than the benefit derived by non-disclosure, will

be discussed together. The manifest purpose of the act is the reformation of wayward and delinquent children, in order to make worthy citizens of those who otherwise probably would become criminals. The jurisdiction of the court has been strictly and specifically limited to cases of this sort. *Colias v. People,* 60 Colo. 230, 153 Pac. 224; *In re Songer,* 177 Pac. (Colo.) 141. That this jurisdiction should be upheld and the relationship thereby created be fostered is manifest from the mere fact that, with general approval, the law creating such tribunal has been enacted and provision made for its support and maintenance. Plainly to destroy this relationship would in effect be to nullify and set aside the chief end and purpose of the enactment itself. It seems plain that anything which would probably bring about such a disaster would do more harm than could possibly be accomplished in good by allowing such testimony to be received because not privileged.

In discussing a juvenile court law similar to the one now under consideration here, in *State v. Scholl,* 167 Wis. 504, 167 N. W. 830, the Supreme Court of that State, at page 508, said:

"A democracy cannot long exist unless the great body of its voters be not merely intelligent, but moral. The children of today are the voters of tomorrow. It is the greatest concern of the State, therefore, that its children be protected from vicious habits, for the vicious child is father of the vicious man. The law before us may be said to be founded on these propositions. Its aim is to keep something like a parental watch over children who are neglected or wayward or both, and hence are subject to vicious influences; to bring them or their parents or guardians before an experienced and humane judge, who shall inquire into the situation, not with the awe-inspiring and frigid methods of a criminal court, but informally and intimately, like a wise and gentle elder brother, or like the good Samaritan of holy writ, and who shall, when fully advised, do that which is best for the child's future, either

by way of sending it to an institution or by providing for kind and tactful but in no sense degrading surveillance for a limited time at home. It would be a public misfortune to set aside a law so designated, even though it were not perfect in details. Only the most weighty and convincing considerations could justify such action, and we do not think they exist here. * * *

"It is sufficient to say on this point that the proceedings under this law are in no sense criminal proceedings, nor is the result in any case a conviction or punishment for crime. They are simply statutory proceedings by which the State, in the legitimate exercise of its police power, or in other words, its right to preserve its own integrity and future existence, reaches out its arms in a kindly way and provides for the protection of its children from parental neglect or from vicious influences and surroundings, either by keeping watch over the child while in its natural home, or, where that seems impracticable, by placing it in an institution designed for the purpose."

In Illinois, the State which furnished the model for the Juvenile Courts of this State, the Supreme Court in upholding the constitutionality of the statute creating such court in *Lindsay v. Lindsay,* 257 Ill. 328, 100 N. E. 892, 45 L. R. A. (N. S.) 908, Ann. Cas. 1914A 1222, said:

"The purpose of this statute is to extend a protecting hand to unfortunate boys and girls who, by reason of their own conduct, evil tendencies, or improper environment, have proven that the best interests of society, the welfare of the State, and their own good, demand that the guardianship of the State be substituted for that of natural parents."

No more important and wholesome benefit in general is possible of attainment than that of making wayward and delinquent children clean, upright and useful citizens. That any relationship which tends to promote this highly desirable object should be encouraged goes as a matter of course. It is equally plain that anything which tends to destroy the trust of the child in the court which has jurisdiction over

such matters must necessarily nullify all possibility of good which otherwise might thereby be accomplished.  To permit the violation of a confidence made by a delinquent to the judge of the court having such matters in charge would at once remove the cornerstone of his faith in the one to whom he is authorized to appeal for help and protection.  It may be that the broad powers and authority conferred by statute upon judges of juvenile courts are such that, in rare and exceptional cases, some judges may take advantage of them for ulterior motives, still, in determining the question involved we are not dealing with isolated cases, or with any individual judge, but in a general way, with a most important system of jurisprudence, highly designed to promote the public welfare through the reclamation and betterment of delinquents, and which as maintained and ordinarily administered, is a vast power for good, concerning which no narrow construction should be indulged tending to weaken or discredit its work.  In view of the wise and humanitarian object of the statute, which should be supported and upheld to the utmost legal extent, we are of the opinion that the communication in question falls within well recognized limitations governing privileged communications, and should, in the interest of the general good, be so treated by the courts.

It is argued, however, that the interview referred to was had before proceedings had been commenced in the juvenile court.  The killing of the father took place about the middle of April, 1915.  On May 18, the son was sent, either by the prosecuting attorney or by a minister of the gospel, who had interested himself in the case, to the juvenile court, where the interview in question with the judge was had.  Between that date and the 8th of June no formal proceedings were instituted in the court against the boy.  On the latter date the judge was called upon to state what took place between himself and the boy at that interview.  It is contended that no official relation whatever had been established between the two and therefore the communica-

tion was not privileged. It seems to be conceded, had such official relation been established, that then the communication would have been of that character.

The statute provides that all juvenile proceedings shall be informal, and that no record thereof shall be published. That the wards of the court are not criminals, but children needing helpful advice and kindly assistance. It is clear that these children are not to be dealt with formally, or in a distant and repelling manner. Upon the whole record it is manifest that the boy appealed to the court for the purpose of invoking its jurisdiction. He came in voluntarily, submitted all the facts to the judge of the Juvenile Court, seeking his advice and protection, and was therefore as much in court as if complaint had been filed against him and process duly issued and served. The plaintiff in error in his capacity as such judge therefore unquestionably acted in a confidential and official capacity and not otherwise. Upon the undisputed facts the communication, in our opinion, should be held privileged even under the terms of the fifth paragraph of section 7274, R. S. 1908, relative to that subject, as follows:

"Fifth. A public officer shall not be examined as to communications made to him in official confidence, when the public interests, in the judgment of the court, would suffer by the disclosure."

In any event it is apparent from the record that the relations established between the parties were such as to render the communication in question, in the strictest sense privileged, independent of statutory provision. To hold otherwise would be to declare that a judge of a Juvenile Court might, by fair promises, gain the trust and confidence of a child, and then betray it. This is not only repugnant to good morals, but to every principle of fairness and common justice. Such a rule would go far to utterly destroy the highly important object for which that court, with its special and peculiar jurisdiction, was primarily created.

A close analysis of the majority opinion plainly discloses

that it is highly technical in character, narrow in construction, and little calculated to give helpful or any assistance in the enforcement of the Juvenile Court law, but rather to needlessly hamper and belittle it, to the end that its wise and humane purposes are in the main apt to be utterly defeated. I am distinctively of the opinion that the construction to be accorded this statute should in the very nature of things be broad and liberal. It is manifest that the one announced by the majority of this court fails utterly to take into consideration the material progress which has been made in judicially providing for the care, management and uplift of delinquent and wayward children through the establishment of courts like the one under consideration, and that consequently the construction given the act by the majority opinion is not in harmony with modern and enlightened jurisprudence. The judgment therefore of the trial court should be reversed and the cause dismissed.

I am authorized to state that Justices Scott and Allen concur in this dissenting opinion.

Decided April 7, A. D. 1919. Rehearing denied June 2, A. D. 1919.