## No. 9566.

### JOSLYN v. THE PEOPLE.

1. CONTEMPT—*Judgment—Order of Commitment.* Error to a Conviction of Contempt. The order of commitment, sufficiently setting forth the facts upon which the conviction rested being found in the record, alleged defects in the judgment were disregarded.

2. *Writing Construed.* A publication charging that the drawing of the Grand Jury then attending the District Court was a piece of chicanery, that the sheriff intentionally selected men who had pre-judged a matter to be submitted to them, from the

standpoint of party politics; that the grand jurors had openly boasted their determination not to enter upon such matter, and that the whole investigation was a farce and a judicial outrage. Held a contempt of the court to which the grand jury was summoned.

3. GRAND JURY—*Conduct of Investigation—Statute Construed.* Section 3700 of the Revised Statute is not controlling where a charge is made affecting the competency of all the members of the grand jury to investigate a matter of public concern.

4. *Duty of Officer Selecting.* An officer who, being charged with selecting and summoning the grand jury, excludes all those acquainted with counsel for the defense, solely upon this ground, is guilty of a gross contempt of court.

5. *Prejudice of Grand Juror, or a sentimental interest in the prosecution,* or opinion expressed, is not such a disqualification as to invalidate the presentments made.

*Semble.* Otherwise where jurors have determined to malice or bribery to violate their oaths.

6. WITNESS—*When May Refuse to Testify,* not because his testimony may influence civil litigation in which he is interested.

Nor because where the question relates to the administration of justice, he assumes to consider the matter about which he is interrogated as his private, confidential and personal business.

*Error to El Paso District Court, Hon. J. W. Sheafor, Judge.*

*Department One.*

Mr. SAMUEL H. KINSLEY and Mr. J. W. KRIGER, for plaintiff in error.

Hon. VICTOR E. KEYES, attorney-general, Mr. WILLIAM R. RAMSEY, assistant and Mr. WILLIS L. STRACHAN for The People.

Burke, J.

JANUARY 13, 1919 in the District Court of El Paso County, a grand jury theretofore in session filed its report, and was discharged. One of the matters undisposed of, for lack of time was the investigation of the department of Public Safety of the city of Colorado Springs. February 27, 1919 another grand jury was impaneled and among

other things given it in charge was the completion of this investigation. On March 7, 1919, while this grand jury was sitting, there appeared in a certain newspaper, "The Labor News", published in the city of Colorado Springs, the following article:

## "CURIOUS COINCIDENCES.

"Isn't it a curious coincidence that the leaders of the County Republicans should boast, after their victory last fall, 'We will now proceed to clean out the City hall?' Isn't it a curious coincidence that a Republican sheriff, when drawing a grand jury to investigate a city department presided over by a Democrat, should happen to find so many jurors who had made their boasts of what they would do to that department if they had the chance? Isn't it a curious coincidence that all of the jurors save one belong to one party? And isn't it a curious coincidence that when this lone Democrat was discovered that a way was discovered to have him resign? Isn't it a curious coincidence that justice should be called blind when she has such a keen vision as that?"

March 22, 1919 there was filed in the District Court of El Paso County "In the matter of Grand Jury January term, 1919" a petition signed by the foreman of the grand jury, setting up the article above quoted, showing to the court that it constituted "a direct charge as to the competency of members of the grand jury" and asking that an investigation be immediately had by the court "to determine the truth or falsity of the charges made, as aforesaid, in order that any members of said grand jury who may be found disqualified to act may be removed therefrom." This petition further prayed that plaintiff in error, as the reputed editor and owner of the newspaper, be summoned as a witness and examined concerning the charges made in the article in question.

This petition was presented to the court and a subpoena ordered issued for the said Joslyn, returnable at 2 P. M. on said date. In response thereto Joslyn appeared in person,

and by counsel who objected to the calling of the witness to testify and to the hearing. This objection was over-ruled and exception saved. Thereupon the witness testi-fied that he was the owner of "The Labor News"; that he was acquainted with the article in question; that he under-stood the department referred to therein was the depart-ment of Public Safety of the City of Colorado Springs; that he knew nothing which would disqualify any member of the grand jury from acting; that he knew of none of them having made a boast such as was referred to in the article. He was then asked if he wrote the article, to which his counsel objected, saying, "He should first be warned by the court or somebody if it might in any man-ner tend to incriminate him." The court replied that the objection would have to come from Mr. Joslyn. The ques-tion was re-read and the witness answered; "I decline to answer that question for the reason it is private, confi-dential and personal business." After some further col-loquy between court and counsel a continuance was granted until 2 P. M. March 24 following, when the witness again appeared in person and by Mr. Kriger and Mr. Kinsley, his counsel. The proceedings of March 22 were read, argument had and authorities cited. Thereupon Mr. Kins-ley stated that the "witness refuses to take the stand, and refuses to answer any further questions in the proceeding, for the reason that the court is without jurisdiction and the order commanding him to take the stand and answer further questions is, and would be void." In answer to the court's inquiry of the witness if he still declined to answer the question he said:

"My counsel has made the statement for me which I endorse. On advice of my counsel, I refuse to take the stand and answer questions." Thereupon the witness was adjudged in contempt and sentenced to be imprisoned in the county jail until he answered the questions submitted to him "or until the further order of the Court."

From this judgment the witness brings error. A stay of execution was granted and the matter is now before us on application for supersedeas.

Mr. Justice Burke delivered the opinion of the Court.

Two contentions are made in behalf of plaintiff in error. First that the judgment is defective in form.   Second that the court exceeded its jurisdiction.

It is unnecessary to dwell long on the first of these, that the judgment was defective in form.   This was a refusal to testify in a judicial investigation of general public concern, hence a direct criminal contempt which might be punished summarily.

*Lindsey v. People,* 66 Colo. 343, 181 Pac. 531.

In such cases the purpose of reciting the facts in the judgment itself is that they may be so fully set forth in the record as to enable the defendant to have the cause reviewed.   It is enough to say that this order of commitment, which is made a part of the record, and is now before us, sufficiently sets forth such facts.

The question of the jurisdiction of the court depends upon the meaning of the article in question and its relation to, and probable effect upon, the grand jury and its work. The meaning of the article is not to be determined from what any one says about it.   It speaks for itself.   Stripped of all self-evident camouflage it is a simple statement that the drawing of the grand jury was a piece of chicanery; that the sheriff who drew it violated his oath of office and selected its members for an ulterior purpose; that he intentionally selected men, who had not only pre-judged the particular matter referred to them by the court, but had prejudged it solely from the standpoint of partisan politics; that they were making no pretension of passing upon its merits but had openly boasted their determination to do the contrary; that they had entered upon their duties with a fixed intention of violating their oath in the discharge thereof; and that, so far as this particular investigation was concerned, the whole proceeding was a farce and a judicial outrage.   We think such is the plain purport of this article and the intention of its author.     That it was calculated to bring discredit upon the grand jury and its

work, and contempt upon the court of which it was an important part, can not be doubted.

Section 3700, Revised Statutes of Colorado, 1908, provides as follows:

"In any case where a grand juror has been sworn and it becomes necessary to investigate his conduct with reference to any charge,   *   *   *   the District Attorney shall briefly set forth such fact in writing to the District Judge, who shall excuse such juror from further attendance, *   *   *   ."

From this it is contended that the whole duty of the court in the present case was to act thereunder. If so this would have required a discharge of all the grand jurors, as the charge was made against all. A similar charge might then have been made against their successors, and it would thus be in the power of one whose conduct was being investigated by a grand jury to effectually block such investigation. This section relates only to a charge pending before the grand jury for investigation. It has no relation to a charge as to the competency of grand jurors as such.

An officer charged with the duty of selecting and summoning jurors, who excludes all those acquainted with counsel for the defense solely upon that ground, is guilty of a gross contempt of court and should be severely dealt with.

*Hargo v. U. S.*, 1 Okla. Crim. 590, 98 Pac. 1021, 20 L. R. A. (N. S.) 1013.

The same is true if the officer were guilty of a similar violation of duty in summoning grand jurors.

Each grand juror is required to take an oath that he "will present no person through malice, hatred or ill-will."

Section 3699, Revised Statutes of Colorado, 1908.

If before taking such oath he has entered into an agreement or conspiracy to violate it, and as a grand juror he is engaged in consummating that agreement or conspiracy, he is clearly in contempt and may be punished.

*U. S. v. Kilpatrick*, 16 Fed. 765.

The general rule is that neither the bias nor prejudice of a grand juror, nor his interest in a prosecution (other than a direct pecuniary interest) nor the fact that he has formed, or expressed an opinion will so disqualify him as to render invalid indictments returned by the grand jury.

20 Cyc. 1300; *U. S. v. Belvin* (C. C.), 46 Fed. 381; *Comm. v. Woodward*, 157 Mass. 516, 32 N. E. 939, 34 Am. St. 302; *Rolland v. Comm.*, 82 Penn. St. 306, 22 Am. Rep. 758.

But we know of no authority which goes so far as to hold that this would be true where jurors had determined, through malice or bribery, to violate their oaths. It is the difference between honest error, to which all men are subject, and that willful corruption which distinguishes the malefactor.

It should be borne in mind that plaintiff in error was not adjudged guilty of contempt for any aspersions cast upon the grand jurors, or upon the sheriff, but for his refusal to answer as a witness in an investigation being conducted by the court to determine the truth of a charge publicly made, that the grand jury, an important part of the machinery of the court, had been turned into an engine of oppression.

A witness may not refuse to testify because such testimony may influence civil litigation in which he is interested.

*Radinsky v. The People*, 66 Colo. 179, 180 Pac. 88.

For the same reason he may not refuse to testify because he considers the matter inquired about as his "private, confidential and personal business."

It was perfectly clear in the present case that a gross contempt of court had been committed, either by the sheriff and some of the grand jurors, or by the publication of the article in question, or both. It is equally clear, and not denied, that that contempt could have been tried and the guilty parties punished in a direct proceeding against them, or any of them, for that purpose. The question here to be determined is "Might the court, upon having the matter called to its attention, proceed first to determine

the probable truth thereof, and call and examine witnesses for that purpose?" The primary object of such an investigation was to purge the grand jury of corrupt members, if any such there were. That object was of more vital importance in the administration of justice than the mere punishment of those who had already offended.

"It is manifest that if the jury is insulted and treated with contempt, the court must protect them, for they can render no judgment and are powerless to protect themselves."

*State v. Shepherd,* 177 Mo. 205-228, 76 S. W. 79, 99 Am. St. 624. So with a grand jury.

Suppose the attack had been printed anonymously and widely circulated in the community, and was thus brought to the attention of the court and while neither author nor publisher were known, witnesses were at hand who could advise the court of their identity. The grand jury could not summon and examine them, because, being powerless to punish the contempt, they were without jurisdiction to investigate it. But can it be said that the court, which had the duty to protect the grand jury, was also powerless, because forsooth the identity of the offender, though easily ascertainable, had not been disclosed?

In an early California case an attorney for one whose conduct was under investigation by a grand jury adressed a letter to the grand jurors reflecting upon their conduct and integrity, and denouncing them for permitting themselves to be corruptly used by a person of wealth for the purpose of finding indictments to gratify his private malice and oppress and crush his adversary. The offense in that case was less serious than the one here under investigation. That was a mere private letter which might only come to the attention of one or more of the grand jurors. This was as public in its nature as it was possible for the offender to make it. There the matter arose upon a review of a judgment in contempt against the writer of the letter. The court said:

"If the invectives against the person named in the letter, and others who are accused of having been hired by him to aid and abet him in his design, were founded upon facts, and the petitioner, as an attorney of the court, *had suggested them to the court* in a regular way, it is not to be doubted that *upon such a suggestion judicial inquiry would have been instituted,* and that, if there were adduced any evidence at all to sustain the suggestion, prompt action would have been taken to vindicate the law, maintain the respect due to the court, and to protect the court and the grand jury under its supervision and legal control against persons implicated in the attempt to commit, or in the commission of, such criminal acts. \* \* \* And such criminal acts are also punishable as contempt of court, for they taint with suspicion the proceedings which they touch; embarrass, hinder, and delay courts in the exercise of their functions; and, if suffered to pass unrebuked and unpunished by the court whose proceedings are tainted by them, they result in a paralysis of judicial confidence. *To prevent, arrest, and punish for such offenses, whether committed or attempted to be committed by or upon any grand juror, is therefore the duty of every court in which such a jury may be sitting in the discharge of its duties;* and *if guilt should be found to attach to members of the grand jury, the jury should be promptly discharged,* and the matters against the members thereof should be referred to another grand jury. \* \* \* It is of the highest importance that jurors and judicial officers should be protected and preserved, not only from all improper influences, but even from the suspicion of such influences. \* \* \* A grand jury should never forget that it sits as a great inquest between the State and the citizen, to make accusations only upon sufficient evidence of guilt, and to protect the citizen against unfounded accusation, whether from the government, from partisan passion, or private malice. But the letter was \* \* \* aimless for any purpose, except to exasperate the jurors by the aspersions upon their official conduct which it contained, or to deter

them from performing their duties by the threats of public clamor which it expressed, or to create a distrust and want of confidence in any action which might be taken as the result of their investigation, and thus to embarrass the court itself in the administration of justice. That such a communication to a jury sitting in or in connection with a court of which it is a component part, and while engaged in the exercise of its functions, is a punishable contempt of court, does not admit of doubt. 'Any publication, whether by parties or strangers, which concerns a case pending in court, and has a tendency to prejudice the public concerning its merits, or which reflects on the tribunal or its proceedings, or on the parties, the jurors, the witnesses, or the counsel, may be visited as a contempt.' Bish. Crim. Law, Sec. 216. It would be strange if, under a government of law, it were otherwise." (Italics are ours.)

In re Tyler, 64 Cal. 434, 1 Pac. 884.

In the instant case the foreman of the grand jury suggested that matter to the court. Upon that suggestion the court did institute a judicial inquiry, as was his duty, and if guilt had been found to attach to the jurors, or any of them, he would doubtless have promptly discharged such jurors, as was also his duty.

Any grand jury foreman who, cognizant of such a publication and acquainted with the duties of his position, should fail to call it to the attention of the presiding judge, would be unfit to be further trusted with his important functions. Any judge who, having such a matter properly called to his attention, should fail to investigate it and, if found true discharge the unworthy jurors and direct the institution of proceedings for their punishment and the punishment of the sheriff, or if found untrue, direct the institution of proceedings for the punishment of their traducers and the protection of the good name and dignity of his court (unless he were powerless to do so), would be unfit to hold judicial office. The simple reason is that if these things were true, or were publicly charged and be-

lieved to be true, indictments returned by such grand jury would be mere scraps of paper. Good citizens acting as petit jurors would refuse to convict thereon, and the court itself would be brought into that contempt and detestation in the community which it richly deserved, and rendered impotent for anything but evil.

The fact that the communication, upon which the inquiry was based, may have prayed action which, in the first instance, would have been improper, by no means nullified the investigation or ousted the court of jurisdiction. This was not a proceeding to punish the author or publisher of "Curious Coincidences", nor to adjudge them in contempt for libeling the sheriff. It was an investigation to determine whether a grand jury, then sitting, was composed of upright and law abiding citizens honestly endeavoring to keep their oaths and act as "a great inquest between the State and the citizens", making accusations "only upon sufficient evidence of guilt", and protecting "the citizen against unfounded accusations, whether from the government, partisan passion, or private malice"; or whether that grand jury was an aggregation of political tricksters, brazenly sitting in the halls of justice in the garb of public functionaries and juggling with the liberties and reputations of men.

For the reasons given the supersedeas is denied and the judgment affirmed.

Garrigues, C. J. and Teller, J., concur.

Decided June 3, A. D. 1919. Rehearing denied October 6, A. D. 1919.