# IN RE APPEAL OF ALAN L. GOODFADER FROM ORDER COMPELLING HIM TO ANSWER QUESTIONS ON DEPOSITION.

## No. 4143.

NOVEMBER 3, 1961.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

318

OPINION OF THE COURT BY CASSIDY, J.

We are concerned on this appeal with the authority of a court to compel a newspaper reporter to divulge his source of confidential information.

Nesta M. Gallas, hereinafter referred to as the plaintiff, instituted an action in the court below against the members of the Civil Service Commission of the City and County of Honolulu, seeking her reinstatement as personnel director of the commission, from which position she had been discharged by a three-to-two vote of the members of the commission at a meeting held on December 16, 1957. It is alleged that the ouster was arbitrary and illegal. The gravamen of the complaint is that the chairman of the commission, Pedro N. Sanchez, and two members, Albert P. Moniz and Masao Watanabe, secretly contrived, conspired and agreed to oust plaintiff from her position and that pursuant to their agreement they

summarily did so at the meeting of December 16, 1957, without granting her notice and an opportunity to be heard and without conferring with or granting the two remaining members of the commission, K. C. Choy and Elsie McG. Burke, an opportunity to deliberate on or discuss the dismissal.[1]

Before issue was joined, the defendants, on June 26, 1958, took the deposition of appellant, Alan L. Goodfader, a reporter for a daily newspaper, who will hereinafter be referred to as the "deponent." In his deposition the deponent testified on direct examination that he attended the meeting of the Civil Service Commission on December 16, 1957, and that he had arranged to have a photographer there. When asked what had led him to call the photographer to attend the meeting he answered: "I believed that an attempt might be made to fire Mrs. Gallas as Personnel Director." He stated his belief was due to "a combination of things," including rumors he began to hear of friction between Mrs. Gallas and some of the commissioners, late in 1956. He said he also noted frequent disagreements between plaintiff and some of the commissioners, relating particular instances, and finally that, "About a week and a half before Mrs. Gallas was fired, I received confidential information that an attempt to fire her was being considered."

On cross-examination the deponent refused to disclose where or from whom he had obtained his information that there might be an attempt to dismiss the plaintiff. He stated: "I'm not at liberty to divulge my source of information"; and as grounds for his refusal that: "It would be a very grievous breach of my professional ethics for me to say anything which might lead back to my source."

---

[1]The complaint discloses that Mrs. Burke resigned from the commission shortly after plaintiff's dismissal. Mrs. Burke's successor on the commission, William W. Paty, Jr., is named as one of the defendants.

He testified he checked the information and was unable to discover any leads to substantiate it but that he became convinced from circumstantial evidence "there was some truth to it." He also testified he "became convinced that Mrs. Gallas knew nothing of it."

On April 3, 1959, plaintiff filed a motion to compel deponent to answer the inquiry on the source of his information respecting her dismissal. A hearing was had on the motion on May 11, 1959. At the close of the hearing the court ruled in favor of the movant and directed her counsel to prepare an appropriate order. Under date of May 22, 1959, the court signed an order requiring deponent, after five days' written notice to defendants of time and place, to appear before the officer who had taken his deposition and answer the questions he had previously refused to answer. The record reveals that on the same date, that is, May 22, 1959, counsel for the plaintiff and for the deponent again appeared before the court and that one of deponent's counsel orally requested the court to reconsider its ruling on the motion to compel. The clerk's minutes indicate that the counsel informed the court he had understood, from a previous conversation with the judge, that the court would entertain such a motion but that the court stated it had understood associate counsel for deponent would file an order for an interlocutory appeal by that date in accordance with the court's prior advice that he could do so and that the court did not "mean that as an invitation to reopen the matter." The clerk's minutes further show that, after argument, the only ruling or direction of the court was to instruct counsel for plaintiff and deponent to collaborate on an order reserving the question to the supreme court, or if counsel were unable to agree to an acceptable order then the court would issue an order allowing an interlocutory appeal.

The order of May 22, 1959, compelling deponent to answer was filed on June 1, 1959. On the same date an order was entered allowing deponent ten days in which to take an interlocutory appeal from the order compelling him to answer. The interlocutory appeal has been perfected and in it appellant attacks the order compelling answer on grounds set forth in his specification of errors, as follows:

"1. The trial court erred in ordering deponent to divulge his confidential source of information relating to the administration of the government.

"2. The trial court's order compelling the deponent to disclose his confidential source of information concerning the doings or misdoings of a public official constitutes an unconstitutional abridgement of the freedom of the press guaranteed by the First Amendment of the United States Constitution and Section 3 of Article I of the Constitution of the State of Hawaii.[2]

"3. The trial court erred in entering said order because the interest to be served by compelling disclosure of the deponent's source of confidential information under the circumstances here present does not justify any impairment of press freedom.

"4. The court erred in entering said order because public policy requires the safeguarding of such sources, at least in the absence of some even more compelling societal need.

"5. It was error for the trial judge to refuse to exercise judicial discretion and in holding that he had

[2]The order appealed from was rendered prior to the admission on August 21, 1959, of Hawaii as a State, so that, notwithstanding the comparability of the provisions on the freedom of the press of our state constitution with those of the First Amendment to the Federal Constitution, the issue here is actually determinable only under the First Amendment. *Territory* v. *Yoshimura*, 35 Haw. 324, 330; *Territory* v. *Lantis*, 38 Haw. 178, 179; *Territory* v. *Delos Santos*, 42 Haw. 102, 110.

no discretion under Rule 30 but to compel deponent's testimony."

We have been favored with thorough briefing by counsel for both the appellant and the *amicus* on the constitutional aspects of this case and are duly impressed by the citation of and the quotations from many of the landmark cases of the pursuasive sweep intended to be given to the Federal Bill of Rights, generally, and with particular reference to the protection afforded by the privileges covered by the First Amendment. We cannot and do not ignore the force of the argument made on appellant's behalf in that respect. There can be no question but that each of the First Amendment freedoms and privileges is to be zealously protected against infringement. The particular freedom involved in this case, that of the press, is one of this country's greatest and most cherished heritages. Its guarded status as well as the reasons and necessity for preserving that status have been affirmed and reaffirmed by the Supreme Court of the United States in the many persuasive pronouncements of that Court to which we are referred and which we have carefully considered.

As appellant emphasizes, one of the primary purposes of the freedom-of-press clause of the First Amendment is to preserve the right of the American people to full information concerning the doings or misdoings of public officials in order to guard against maladministration in government. This fundamental truth is recognized and stated in *Grosjean* v. *American Press Co.,* 297 U.S. 233, 250, as follows:

"The predominant purpose of the grant of immunity here invoked was to preserve an untrammeled press as a vital source of public information. The newspapers, magazines and other journals of the country, it is safe to say, have shed and continue to

shed, more light on the public and business affairs of
the nation than any other instrumentality of publicity;
and since informed public opinion is the most potent
of all restraints upon misgovernment, the suppression
or abridgement of the publicity afforded by a free press
cannot be regarded otherwise than with grave concern.
* * * A free press stands as one of the great inter-
preters between the government and the people. To
allow it to be fettered is to fetter ourselves."

Another landmark case referred to is *Near* v. *Minne-
sota,* 283 U.S. 697, in which, at p. 716, the historic concept
of freedom of the press is pronounced thusly:

"The exceptional nature of its limitations places
in a strong light the general conception that liberty
of the press, historically considered and taken up by
the Federal Constitution, has meant, principally al-
though not exclusively, immunity from previous re-
straints or censorship. The conception of the liberty
of the press in this country had broadened with the
exigencies of the colonial period and with the efforts
to secure freedom from oppressive administration.
That liberty was especially cherished for the immunity
it afforded from previous restraint of the publication
of censure of public officers and charges of official
misconduct."

The broad sweep of the First Amendment as applied
to the press in the gathering of news is stated in *Asso-
ciated Press* v. *United States,* 326 U.S. 1, at p. 20, as
follows:

"* * * The First Amendment, far from providing
an argument against application of the Sherman Act,
here provides powerful reasons to the contrary. That
Amendment rests on the assumption that the widest
possible dissemination of information from diverse and
antagonistic sources is essential to the welfare of the

public, that a free press is a condition of a free society."

In *Bridges* v. *California,* 314 U.S. 252, the basic purpose underlying the Bill of Rights generally and the scope of the protection of the press particularly is clearly stated at p. 265, as follows:

"* * * No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed. It cannot be denied, for example, that the religious test oath or the restrictions upon assembly then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing. And since the same unequivocal language is used with respect to freedom of the press, it signifies a similar enlargement of that concept as well. Ratified as it was while the memory of many oppressive English restrictions on the enumerated liberties was still fresh, the First Amendment cannot reasonably be taken as approving prevalent English practices. On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society."

However, despite the broad scope and protective status of the First Amendment freedoms and privileges, it is clear that none of them is absolute, and that whether, in any given case, an asserted right under that amendment will prevail or not depends upon the particular circumstances involved and the weighing and balancing of the protection afforded by the right asserted against the purposes that would be defeated or denied by recognition

of the freedom or privilege. The private or individual interest involved must, in each case, be weighed in balance against the public interest affected. In *Konigsberg* v. *State Bar of California,* 366 U.S. 36, this well established principle is stated, at pp. 49-51, as follows:

"At the outset we reject the view that freedom of speech and association (National Asso. for Advancement of Colored People v. Alabama, 357 US 449, 460, 2 L ed 2d 1488, 1498, 78 S Ct 1163), as protected by the First and Fourteenth Amendments, are 'absolutes.' * * * Whenever, in such a context, these constitutional protections are asserted against the exercise of valid governmental powers a reconciliation must be effected, and that perforce requires an appropriate weighing of the respective interests involved."

See also *Watkins* v. *United States,* 354 U.S. 178, 198; *National Assn. of Colored People* v. *Alabama,* 357 U.S. 449; *Barenblatt* v. *United States,* 360 U.S. 109, 126; *Communist Party* v. *Subversive Activities Control Board,* 367 U.S. 1, pp. 90-91.

Another fundamental principle inherent in our form of government as an essential part of due process of law is that a litigant, when resorting to the courts for redress of grievances or determination of rights, is entitled to judicial aid in compelling the attendance and the testimony of witnesses. Correlatively, every person, properly summoned, is required to attend court and give his testimony unless specially exempted or privileged. "[I]t is also beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned." *Blackmer* v. *United States,* 284 U.S. 421, 438.

In *Blair* v. *United States,* 250 U.S. 273, at p. 281, the Court elaborates on the subject, as follows:

"In all of these provisions, as in the general law upon the subject, it is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned, and for performance of which he is entitled to no further compensation than that which the statutes provide. The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public. The duty, so onerous at times, yet so necessary to the administration of justice according to the forms and modes established in our system of government (Wilson v. United States, 221 U.S. 361, 372, quoting Lord Ellenborough), is subject to mitigation in exceptional circumstances; there is a constitutional exemption from being compelled in any criminal case to be a witness against oneself, entitling the witness to be excused from answering anything that will tend to incriminate him (see Brown v. Walker, 161 U.S. 591) ; some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all that he knows.

"But, aside from exceptions and qualifications— and none such is asserted in the present case—the witness is bound not only to attend but to tell what he knows in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry.

"He is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his. Nelson v. United States, 201 U.S. 92, 115."

The Supreme Court of the United States has never

ruled on the question of whether compelling a reporter to disclose his confidential news source constitutes an infringement of the freedom of the press.[3]  Our attention has been directed to one case, *Burdick* v. *United States,* 236 U.S. 79, in which that Court upheld the right of an editor to refuse to reveal his source of information.  The right asserted was, however, under the Fifth, and not the First, Amendment.  The effect of the distinction is clearly pointed out in *Barenblatt* v. *United States, supra,* at p. 126, as follows:

> "[T]he protections of the First Amendment, unlike a proper claim of the privilege against self-incrimination under the Fifth Amendment, do not afford a witness the right to resist inquiry in all circumstances.  Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown."

Appellant contends that the freedom to gather news is inseparable from the freedom to print news, that both are equally indispensable to a free press and therefore a restraint on gathering news (such as would occur in the absence of a reporter's ability to assure the confidentiality of his news sources) is, in itself, an infringement of the free press clause of the First Amendment.  We readily perceive the disadvantages to a news reporter where his desire to remain silent under a pledge of confidentiality is not accommodated, but we are unable to find, in any of the many decisions touching on the First Amendment

[3] In *Garland* v. *Torre, infra,* the issue was squarely raised but *certiorari* was denied. See *Torre* v. *Garland,* 358 U.S. 910. By stipulation we have been furnished a copy of the record in an unreported Colorado case, *In re Vi Murphy,* in which a reporter was held in contempt for refusing to disclose her confidential source of news. The constitutional issue was also directly raised in that case. Again, *certiorari* was denied. See *Murphy* v. *Colorado,* 365 U.S. 843.

that we have been referred to and have considered, any basis for concluding that the denial of a claim under the newsman's code constitutes an impairment of constitutional rights.

In arguing the point, appellant incidentally refers to a report of the New York Law Revision Commission's exhaustive study on the problems of protecting newsmen against disclosure of news sources and quotes from the report as follows: "The newsman's case differs from other cases where no privilege exists as to information obtained in confidence, in that the newsman is performing the important function of keeping the public informed. A privilege to newsmen may therefore be justified when a privilege to others receiving information in confidence would not." State of New York Legislative Document (1949) No. 65 (A), p. 4.

While the statement quoted reflects the commission's views and is one of the bases for its recommendation to the New York legislature that a privilege "with safeguards essential to the protection of the public interests" may be safely granted by the legislature to newsmen, it clearly affords no support for the argument that a newsman's privilege exists on a constitutional or any other basis. In this connection it might be noted, as more in point, that the same report also states (at p. 5): "The present absence of a privilege to newsmen does not infringe on the freedom of the press. Constitutional guarantees when enacted did not themselves grant the privilege. The power to compel disclosure has stood side by side with the constitutional guarantee of freedom of the press since the enactment of the Bill of Rights. There is no more infringement of constitutional rights in compelling a newsman to disclose the sources of his information than there is in compelling any other person to make a disclosure. No limitation whatever on the right to publish is imposed."

We have not been convinced that there is a First Amendment protection available to deponent. However, in the absence of any authoratative ruling by the court having the final say on the matter, we will assume, for the purposes of this case, that the forced disclosure of a reporter's confidential source of information may, to some extent, constitute an impairment of the freedom of the press. We nevertheless conclude, in accord with the analysis and the holding on the same hypothesis in *Garland* v. *Torre,* 2 Cir., 259 F. 2d 545, that such an impairment may not be considered of a degree sufficient to outweigh the necessity of maintaining the court's fundamental authority to compel the attendance of witnesses and to exact their testimony if not otherwise privileged or protected.

In holding the Federal Constitution afforded a reporter no right to refuse to disclose a confidential news source, the court stated in the *Garland* case at pp. 548-549:

"As to the Constitutional issue, we accept at the outset the hypothesis that compulsory disclosure of a journalist's confidential sources of information may entail an abridgement of press freedom by imposing some limitation upon the availability of news. * * *

"But freedom of the press, precious and vital though it is to a free society, is not an absolute. What must be determined is whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom. * * *

"Freedom of the press, hard-won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press. * * *

"If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice."

Since we hold the deponent has no constitutional right to refuse to answer questions respecting his source of information, the next question is whether he is protected against disclosure on any other basis or for any other reason. This brings us to direct consideration of Rule 26, H.R.C.P.

Paragraph (a) of Rule 26 provides, in part, that "Any party may take the testimony of any person, including a party, by deposition upon oral examination or written interrogatories *for the purpose of discovery or for use as evidence* in the action or for both purposes." Paragraph (b) of the rule specifies the scope of examination permitted, as follows: "Unless otherwise ordered by the court as provided by Rule 30(b) or (d), *the deponent may be examined regarding any matter, not privileged,* which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the examining party or to the claim or defense of any other party, *including* the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and *the identity and location of persons having knowledge of relevant facts. It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence."* (Emphasis added.)

The term "not privileged" as used in Rule 26 and in the other discovery rules refers to privileges as the term is understood in the law of evidence (*United States* v. *Reynolds,* 345 U.S. 1, 6), and it is a firmly established

principle of law that in the absence of statutory grant a newsman has no evidentiary privilege permitting him to refuse to disclose the source of information given to him in confidence.

"It is clearly the general rule that communications made to a journalist do not enjoy any privilege against use as evidence, and newspapermen may be compelled to reveal information given to them in their professional capacity." 102 A.L.R. 771.

"The rule of privileged communications does not, in the absence of statute, apply to communications to a newspaper editor or reporter, for, although there is a canon of journalistic ethics forbidding the disclosure of a newspaper's source of information, it is subject to qualification and must yield when in conflict with the interests of justice." 97 C.J.S., *Witnesses,* § 259, p. 743.

"Unless otherwise specifically provided by statute, communications to newspapers or to newspaper reporters or editors are not privileged. And so, a reporter cannot claim exemption as a witness from answering a question, on the ground that he had received the information under a promise that he would not divulge the name of his informant, and that to do so would subject him to ridicule and contempt, and would cause him to lose his position as a newspaper reporter." 58 Am. Jur., *Witnesses,* § 546, p. 305.

In 1914, Judge Clemons, in denying the efficacy of an editor's claim of privilege in this jurisdiction, stated in *In re Wayne,* 4 U.S. Dist. Ct. Haw. 475, at p. 476:

"In the opinion of the court, the position of the witness is untenable. Though there is a canon of journalistic ethics forbidding the disclosure of a newspaper's source of information,—a canon worthy of respect and undoubtedly well-founded, it is subject to

a qualification: It must yield when in conflict with the interests of justice,—the private interests involved must yield to the interests of the public."

The opinion quotes Wigmore, as follows:

"For 300 years it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. We may start, in examining the various claims of exemption, with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional and are so many derogations from a positive general rule." 4 Wigmore, *Evidence*, § 2192, p. 2965.

"In general, the mere fact that a communication was made in express confidence, or in the implied confidence of a confidential relation, does not create a privilege. This rule is not questioned to-day. No pledge of privacy, nor oath of secrecy, can avail against demand for the truth in a court of justice. . . . Accordingly, a confidential communication to a clerk, to a trustee, to a commercial agency, to a banker, to a journalist, or to any other person not holding one of the specified relations hereafter considered, is not privileged from disclosure." *Id.*, § 2286, p. 3186.

Other cases indicating the uniformity of holding in this country that in the absence of statute there is no evidentiary privilege in favor of a newsman are: *Clein* v. *State*, Fla. 1950, 52 So. 2d 117, 120; *People* v. *Sheriff of New York County*, 269 N.Y. 291, 199 N.E. 415; *Pledger* v. *State*, 77 Ga. 242, 3 S.E. 320, 322; *Plunkett* v. *Hamilton*, 136 Ga. 72, 70 S.E. 781, 785; *Joslyn* v. *People*, 67 Colo. 297, 184 Pac. 375, 377; *People* v. *Durrant*, 116 Cal. 179, 48 Pac. 75, 86; *State* v. *Donovan*, 129 N.J.L. 478, 30 A. 2d 421, 425; *Brewster* v. *Boston Herald-Traveler Corp.*, D.C.

Mass., 24 Fed. Rules Serv. 459, 460. We have been cited no case holding to the contrary.

Appellant makes the point that, "There is no judicial precedent in this jurisdiction or elsewhere requiring newsmen in private litigation to divulge their sources of information relating to the administration of the government."

While it is true that most of the cases on the question of a newsman's privilege directly involved public interest in the subject matter of litigation which was prosecuted by a public official, the distinction appellant urges is not compatible with the generality of the language used in the decisions in laying down the broad rule that a newsman does not have an evidentiary privilege. No authority is cited by appellant in support of his unique proposal to engraft this exception on the general rule. We see no reason for or logic in limiting a private litigant's right to testimony merely because his cause arises out of or involves official action.

In this jurisdiction no statutory privilege against disclosure is extended to newsmen. Consistently with the foregoing general rule, therefore, no such privilege should be judicially recognized. However, it is stated that this is a vitally important case to the new State of Hawaii and as the issue presented is a matter of first impression, we are urged to pioneer in the field and take advantage of the "opportunity to establish unequivocally that the right of a free press guaranteed by the constitution of our state shall be given as broad a scope as is necessary to insure a truly free press." Also, it is said: "To accomplish this objective confidential sources of information must be held to be immune from compulsory disclosure and appellant's silence a constitutionally protected right." Although urged primarily from a constitutional standpoint, alternately, it is argued that the same result is

necessary from a modernistic public policy standpoint. What, in effect, is actually asked of us is to create an evidentiary privilege in favor of newsmen. We are not favorably disposed to the invitation and our reasons for declining it are well put in *People* v. *Sheriff of New York County, supra,* at pp. 415 - 416, as follows:

"There is no statute in this state covering the subject. It is urged by appellant that the basis for the privilege granted in the cases where it is conceded to be properly granted exists in the case of a reporter. Attention is called to the fact that in addition to the statutory privileges existing between attorney and client, husband and wife, physician and patient, and certain others (Civil Practice Act, §§ 353, 349, 351, 352), there also exist certain common-law cases where the privilege is granted, like communications made to a judge, to a district attorney, and to police officers in the performance of their duties, and it is urged that the principle underlying the granting of those privileges exists in the case of a reporter. Appellant admits that no court has ever so decided, but urges that the development of the law and changes in social relations require that courts now extend the privilege to a reporter."

\* \* \*

"The policy of the law is to require the disclosure of all information by witnesses in order that justice may prevail. The granting of a privilege from such disclosure constitutes an exception to that general rule. In the administration of justice, the existence of the privilege from disclosure as it now exists often, in particular cases, works a hardship. The tendency is not to extend the classes to whom the privilege from disclosure is granted, but to restrict that privilege.

"On reason and authority, it seems clear that this

court should not now depart from the general rule in force in many of the states and in England and create a privilege in favor of an additional class. If that is to be done, it should be done by the Legislature which has thus far refused to enact such legislation."

That there is neither a constitutional nor an evidentiary privilege justifying the deponent's refusal to disclose does not, however, determine the issue. The answers sought by the plaintiff, which the deponent refused to give, could not in themselves be relevant to the subject matter involved in the action. They were not sought for that purpose, but for the purpose of obtaining information "of persons having knowledge of relevant facts." As such, the plaintiff's right to pursue the inquiry and to obtain deponent's testimony on the source of his information is controlled by the last sentence of Rule 26(b), reading: "It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence."

The extent to which discovery is permitted under Rule 26 (as well as under Rules 33 and 34) is subject to considerable latitude and discretion. *Lewis* v. *United Air Lines Transport Corporation,* D.C. Conn., 27 F. Supp. 946; *Engl* v. *Aetna Life Ins. Co.,* 2 Cir., 139 F. 2d 469; 4 Moore's Federal Practice § 26.17, pp. 1070-1071. When the court is called on to rule whether or not to allow discovery in any particular case, consideration should be given to all factors, including the effect the inquiry might have on the person to be interrogated. Where information is sought from a newsman, one of the factors that ought to be taken into account is the recognized newsman's code proscribing disclosure of the source of news given him in confidence. In our opinion the situation presented here may be considered somewhat comparable to that in

*Hickman* v. *Taylor,* 329 U.S. 495, where the Court held that notwithstanding the absence of an evidentiary privilege, information obtained by an attorney from witnesses, in preparing a case for a client, was not necessarily subject to discovery. The Court stated in that case, at pp. 507-508:

> "We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. * * * But discovery, like all matters of procedure, has ultimate and necessary boundaries. As indicated by Rules 30(b) and (d) and 31(d), limitations inevitably arise when it can be shown that the examination is being conducted in bad faith or in such a manner as to annoy, embarrass or oppress the person subject to the inquiry. And as Rule 26(b) provides, further limitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege."[4]

We are accordingly required to determine whether the inquiry plaintiff desired to make was of enough importance to her case and appeared sufficiently likely to be productive to warrant disregarding or overriding deponent's obligation to the tradition of his calling.[5] And in this connection we do not think it is necessary to go to the extent of finding that the information sought from deponent "goes to the heart of plaintiff's case" as appellant, in

---

[4] The *Hickman* case was decided before Rule 26(b) was amended to include the last sentence of the present version of it, quoted above, but the limitations stated respecting inquiries touching upon what might be termed near-privileged matters should, we think, still pertain.

[5] We respectfully differ from the view of the concurring justice that we should not take cognizance of this point in the absence of defendants. While it is true that the record does not show service on defendants of the notice of appeal, it is apparent from the record that they were fully aware of the pendency of this appeal. They have made no attempt to intervene. They appeared through counsel in the court below on the hearing of May 11, 1959, but took no active part in it. Their apparent indifference in the matter is further indicated by the statement of their counsel at the conclusion of the taking of appellant's deposition that,

attempting to distinguish *Garland* v. *Torre, supra,* stresses that the court in that case found in respect to the inquiry of the reporter there made.

From the nature and theory of the claim for relief set out in the complaint, as to the merits of which we voice no opinion, the key fact required to be proved in order to substantiate the alleged claim is the purported prior secret connivance of the chairman of the commission and the two members who voted with him to oust plaintiff. In the issue as joined, these three defendants deny any prior collaboration. In their amended answer (filed August 4, 1958) it is in effect averred that the matter of plaintiff's dismissal was first brought to light when the chairman read a statement making that recommendation, at the meeting of December 16, 1957. Obviously, then, it might be highly important to plaintiff's alleged cause of action for her to be able directly to disprove that the matter of her dismissal was of as spontaneous origin as these three defendants aver. Also, it should not be unreasonable to presume that whoever was able to tell the deponent that "an attempt to fire her [plaintiff] was being considered," when considered in light of the fact that the dismissal actually occurred, summarily, some ten days later, quite likely had information traceable to one of the commissioners voting for ouster that her dismissal was pending.[6]

---

"As far as I'm concerned, we'll respect the privilege—claim the privilege—and let it go at that." Plaintiff makes no point of the absence of defendants as formal parties here. Deponent, of course, is not in a position to do so. All circumstances considered, it is our view that the appellant's failure to join defendants as parties-appellee and the lack of any formal appearance by them should not bar us from considering and determining any of the issues raised on this appeal. Our holding in this respect is without prejudice to any defense of the defendants in law or fact.

[6]Deponent did not testify that his informant told him "that there might be an attempt to fire Mrs. Gallas," as is argued on his behalf. Deponent did testify that, from a number of factors, that was his belief, but the confidential information given to him was specifically, "that an attempt to fire her was being considered."

In his deposition, deponent testified that he attempted to follow up his lead, without results, and it is argued on his behalf that, therefore, what the plaintiff is asking for is a "fishing expedition" based on mere rumor. We think not. Although deponent did testify he had heard rumors of friction between the plaintiff and some of the commissioners as far back as late 1956—the specific information given him by his confidential source shortly before plaintiff's dismissal is too positive to be considered in the same category.

There, of course, can be no assurance that if plaintiff is permitted to pursue her inquiry she will obtain from deponent's answers the identity of anyone who can substantiate the basic point of her alleged case. But that is not the criterion to be applied. As stated in *Miller* v. *Sun Chemical Corp.*, D.N.J., 12 F.R.D. 181, at p. 182: "The language [of Rule 26] is broad. It cannot be said that the matters inquired into were not relevant to the subject matter or that they would not 'lead to the discovery of admissible evidence.' Would that judges had the means of divination to forecast the former resulting in the latter with unfailing accuracy. We can only be as accurate as a weather forecaster. Need I say more?" In the same mood, we can only say that it is our best judgment that the inquiry desired to be made by plaintiff in this case could be considered likely enough to lead to the discovery of sufficiently important admissible evidence to warrant the trial court's permitting her to pursue it notwithstanding deponent's claim of ethical privilege. The lower court's ruling should therefore be approved unless any of the incidental contentions of appellant, considered hereunder, require a different result.

One of the incidental contentions of appellant is that it was an abuse of discretion, and error, for the trial judge to order the deponent to answer under circum-

stances indicating that "there is no showing that the desired information could not have been secured from other sources." Consideration of this point will necessitate adverting to other features appearing of record at the time of the court's ruling.

Plaintiff had taken the deposition of the chairman and the two members of the commission who had voted with him. Each of the two members disclaimed any prior knowledge of the action taken on December 16, 1957, and consequently denied having discussed the matter either among themselves or with any other person. The chairman of the commission denied discussing the matter with any of the members of the commission. He did state, however, that a few days before December 16, 1957, he began to prepare a statement recommending the ouster of Mrs. Gallas and that he had the assistance of his wife in typing the statement. He also stated that some three or four days before the meeting he informed the Mayor of the City and County of Honolulu of his intention to recommend her dismissal. While it appears possible, from the chairman's deposition, that the mayor and Mrs. Sanchez, or either of them, might have possessed the same information given to deponent in confidence, we think that plaintiff's efforts in taking the deposition of the chairman and the two members of the commission hostile to her constituted sufficient attempt on her part to obtain the desired information, particularly when it is considered that the deponent stated he had acquired the information that the dismissal of Mrs. Gallas was being considered some ten days before the ouster, while Mr. Sanchez's disclosure of his intention to the mayor and Mrs. Sanchez occurred only three or four days prior to the actual dismissal. Further, it does not appear from the record that in resisting the motion to compel, any particular objection was made that plaintiff had not ex-

hausted her efforts to secure the information desired from other sources. The point appears to be raised as an afterthought and we do not consider it of sufficient moment to warrant reversal. However, if deponent insists upon plaintiff's first pursuing her inquiry to learn whether or not Mrs. Sanchez and the mayor, or either of them, possessed knowledge that an attempt to dismiss her was being considered, our action on this appeal is not to be taken as a bar to presenting the matter on remand for the trial court's consideration and further ruling in light of whatever might be developed from any such inquiry.[7]

Appellant urges also that the trial court committed error in refusing to exercise judicial discretion and in holding it had no discretion but to compel deponent's testimony. In presenting argument on this point, it is stated in the opening brief:

"At the hearing on plaintiff's Motion to Compel Answer to Oral Interrogatory, counsel for deponent offered to introduce in evidence the testimony of two newspaper men in order to establish a 'factual situation' (Tr. pp. 1, 2). Although the transcript is incomplete because of the apparent belief of the court reporter that most of counsel's assertions consisted of oral argument which the reporter was not required to record, the statements appearing in the transcript can only mean that counsel for deponent was attempting to establish an evidentiary basis for the exercise of judgment and discretion by the trial judge in the balancing of the conflicting interests involved in the case. This offer was summarily denied by the court on the ground that the sole question before the court was whether or not the deponent was protected by

---

[7] In this connection it is, of course, to be noted that any effort to interrogate Mrs. Sanchez will be subject to application of the provisions of R.L.H. 1955, § 222-19, if invoked.

an evidentiary 'privilege' and that. the determination
of this question was a matter of law which required
no evidence. The court said:

 " ' . . . where it is a basic question you have to
 determine, whether that is a rule of evidence or
 a rule of weighing the facts in a particular case
 because if it is a rule of evidence, it doesn't make
 any difference. . . . (Tr. p. 1)

 . . . .

 " 'It seems to me this falls directly in the cate-
 gory of privilege—if there is one all right, if there
 isn't, it doesn't make any difference.' (Tr. p. 2)."

The transcript consists of excerpts noted by the re-
porter of occurrences at the hearing on May 22, 1959, not
of the hearing on May 11, 1959, at which earlier hearing
the court ruled on and disposed of the motion to compel.
The hearing on May 22 was obviously extended but the
transcript offered us consists of only one and a half pages.
In addition to the excerpts quoted in appellant's brief
the transcript covers the request of deponent's counsel
to be permitted to call two bystanding newspapermen as
witnesses upon the representation of counsel, as follows:

"I don't know anything about what their testimony
would be. I would like the privilege in support of the
objection raised to ask some questions on the witness
stand and offer them as part of our testimony."

\* \* \*

"Will Your Honor give me permission—I don't know
—I haven't the vaguest idea, but I assume these are ex-
perienced newspapermen. Would you permit me to put on
just two witnesses, take a very short time, and at least
we'll get some factual situation."

The effort made on May 22 to reopen and reconsider
the court's ruling of May 11 comes within the purview
of Rule 59, and by its nature, under Rule 7(b), should

have been made in writing stating "with particularity the grounds therefor." The oral motion in this case was of no legal significance. *Marn* v. *Reynolds,* 44 Haw. 655, 659, 361 P. 2d 383. Further, no offer of proof was made by counsel. From counsel's representation to the court none could have been made. But aside from these deficiencies, it is obvious, as was practically conceded by counsel on oral argument in this court, that the "factual situation" intended or hoped to be established by the two newsmen in the courtroom pertained only to the existence of the newspaperman's code and the effect on a reporter from a court's refusal to permit him to abide by it. As stated by one of appellant's counsel on argument in this court: "Well I think what we wanted to establish, fundamentally, was that any rule of law which renders a pledge of confidence given by a journalist to an informant—a complete nullity, reduces the ability of the journalist to obtain information, and I think that was one of the points we wished to establish." In rendering this opinion we have taken cognizance of the newspaperman's code and the desirability, from a public policy standpoint, of giving it recognition if reasonably possible. We are fairly certain that the lower court was similarly minded, so that even if the matter had been properly presented to the lower court, and adequately reserved for review by this court, it is clear that the denial of the deponent's oral request to be permitted to put the two newspapermen on the stand has not prejudiced him.

The final point for consideration is the claim that the court committed error in refusing to exercise discretion in making the ruling appealed from. This contention is predicated on the above-quoted isolated excerpts of the court's remarks on May 22, 1959, as set out in the truncated transcript, and the assertion in brief and on argument, that one of deponent's counsel in the court below

urged. that the court was required to exercise discretion in the application of. the inquisitorial portion of Rule 26, but the court refused to listen to the argument. As that counsel stated on oral argument: "The court refused to listen to it, in effect saying: 'I rule that it is not privileged and therefore I will exercise no discretion in the matter.' He said that. I am sorry I didn't get it in the transcript. He said over and over: 'It is either privileged or it is not privileged.' "

It should be apparent that the attempt made by counsel to augment the record in the manner stated is improper. We are unwilling to sanction it. To do so would be a departure from the traditional order and set a precedent that would lead to nothing but confusion and disorder. It is clearly the obligation of counsel in any case to see to it that his objections to or grounds for action are made a part of the record. In this case, if there had been a proper compliance with the requirements of Rule 7(b) the matter would have been set to rest by the contents of a written motion. Also, the excerpts of the trial judge's comments on May 22, respecting the basis of his ruling on May 11, are too equivocal to support counsel's contentions. Finally, on the certified record it definitely appears that notwithstanding the remarks made by the court on the subsequent hearing of May 22, in making its ruling on May 11 the court did recognize the newspaperman's code of confidence, but denied the application of it in this case because it was the court's judgment that consideration of other factors in the case warranted and required such action. This clearly appears from the entry in the clerk's minutes that, on May 11, at the conclusion of the hearing on the motion to compel, "The Court stated it was very impressed by the argument of counsel for Plaintiff and is concerned with the value of confidential sources of information to the newspaper

people. However, in Plaintiff's case under all the circumstances, it would appear that it is very likely to lead to something of extreme value to their case and that is one of the basic functions of discovery, to seek leads. For that reason, this outweighs the other considerations. The Motion to Compel is granted." Upon a complete review of the record in the light of the principles discussed above, we can find no merit in the contention that the trial court abused its discretion in granting the motion.

In accordance with the foregoing, the order compelling the deponent to disclose his source of confidential information is affirmed and the cause is remanded for further proceedings consistent with this opinion.

*J. Russell Cades* and *Harold S. Wright* (*Smith, Wild, Beebe & Cades,* of counsel) for deponent-appellant.

*James H. Kamo* and *Hiroshi Sakai* for plaintiff-appellee.

*Harriet Bouslog* (*Bouslog & Symonds,* of counsel) filed a brief for Hawaii Newspaper Guild, Local 117, American Newspaper Guild, AFL-CIO, *amicus curiae,* but did not argue.

CONCURRING OPINION OF LEWIS, J.

I concur in what is said in the opinion of the court to and including note 4, though with reservations as to the significance of the last paragraph of the quotation from *Blair* v. *United States,* 250 U.S. 273, 281. I also concur in what is said toward the end of the opinion, concerning deponent's contention that the trial court refused to exercise judicial discretion and held it had no discretion; at the hearing held May 11, 1959 the court both recognized and proceeded to exercise the discretion possessed by it.

I am persuaded, however, that in the posture of the

case as it comes before us we are not required to and indeed cannot determine "whether the inquiry plaintiff desired to make was of enough importance to her case and appeared sufficiently likely to be productive, to warrant disregarding or overriding deponent's obligation to the tradition of his calling." We are unable to review the court's ruling on that question in the absence of defendants, who have not been brought before this court. Accordingly, having given our answers to the reviewable questions (the claim of privilege, and specification of error No. 5 asserting that the trial judge refused to exercise judicial discretion), and having found no ground for reversal as to those matters, we should affirm without going further.

This is an interlocutory appeal from an order made under H.R.C.P., Rule 37(a). Rule 37(b) has not yet been invoked. In the trial court, defendants were represented by counsel at the hearing of May 11, 1959 though not at the hearing of May 22, 1959. Defendants were "parties to the judgment"; under the federal rule the clerk would have mailed them a copy of the notice of appeal. Under our comparable provision, H.R.C.P., Rule 73(b), deponent should have served upon them notification of the filing of the notice of appeal.

While under Rule 73(a) service of the notice of appeal is not a jurisdictional step (*Clifford* v. *Clifford*, 43 Haw. 48; *Laupahoehoe Sugar Company* v. *Lalakea*, 27 Haw. 682), appellant must bring into court all necessary parties or hazard dismissal. *Lufkin* v. *Grand Hotel Co.*, 24 Haw. 744, 748. Appellant has the burden of complying promptly with all the requirements of Rules 73 and 75. *Clifford* v. *Clifford*, *supra*. These requirements include service by appellant on all affected parties (see Rule 5(a)) of the notice of appeal and other papers specified in the rules.

346

In this case appellant, the deponent, has not sought to bring defendants before this court;[1] deponent contends that defendants are not necessary parties. Plaintiff contends that defendants are before this court, but it was not for them or for the clerk to shape the case.[2] Plaintiff did not seek an order of this court that defendants be joined as parties to this appeal. Defendants have made no appearance.

The taking of the deposition constitutes a collateral matter, and the parties entitled to take the appeal, also those who are necessary parties to the appeal, are to be determined accordingly. *Cf., Mills* v. *Smiley,* 9 Idaho 317, 76 Pac. 783; *Anglo-Californian Bank* v. *Superior Court,* 153 Cal. 753, 96 Pac. 803; *Keating* v. *Keating,* 43 Haw. 51; *Doggett* v. *Deauville Corp.,* 148 F. 2d 881 (5th Cir.); *Mitchell* v. *Lay,* 48 F. 2d 79 (9th Cir.). Had deponent not sought an evaluation of the importance of the information demanded of him, then as in *Mills* v. *Smiley, supra,* the only other necessary party would be the one who obtained the court's process against him, *i.e.,* the plaintiff who obtained the order under Rule 37(a) compelling deponent to answer. But in seeking to argue the importance of the information sought of him, deponent in effect relies upon H.R.C.P., Rule 30(d); this must be taken into consideration.

It is deponent's own position that Rule 30(d) is involved; answering plaintiff's contention that deponent has no right to rely on Rule 30 in view of his not having

---

[1]The notice of appeal, statement of points on appeal, designation of contents of record on appeal, and opening brief of deponent, show only the service on plaintiff, and a stipulation dispensing with bond on appeal bears only the signature of her attorneys.

[2]The clerk of the court below placed the names of the attorneys for defendants on the flyleaf of the record on appeal as "attorneys for defendant-appellees," and the clerk of this court notified defendants of the entering of the case on our calendar; plaintiff served her brief on defendants' counsel.

made a motion under Rule 30(d) to limit the examination, deponent contends that his action in resisting the motion under Rule 37(a) "was in substance, if not form, a motion for an order prohibiting inquiry into certain matters and limiting the scope of the examination." Assuming for present purposes that the matter should be so viewed, this but serves to emphasize that defendants are necessary parties, under the general rule that "every person to be directly affected in his interests or rights by a judgment on appeal * * * is entitled * * * to have notice thereof, and an opportunity of being heard and defending his rights." *Ting* v. *Born*, 21 Haw. 638, 641; *Lufkin* v. *Grand Hotel Co., supra*, 24 Haw. 744, 748.

H.R.C.P., 30(a) provides for notice of the taking of a deposition upon oral examination to "every other party to the action." Here defendants gave notice of the taking of Mr. Goodfader's deposition. In response to defendants' notice, plaintiff appeared and carried the questioning into the sensitive area, thus stimulating what in effect was a motion by deponent under Rule 30(d) for limitation of the examination. When the matter reached that point, the other parties present and participating in the taking of the deposition could not be sloughed off.

It is the parties who frame the issues. A witness cannot assert a party's objections to the cause of action or the materiality of the testimony sought from him. *Fenton* v. *Walling*, 139 F. 2d. 608 (9th Cir.); *Nelson* v. *United States*, 201 U.S. 92, 114, 115 (cited in *Blair* v. *United States*, 250 U.S. 273, 282, a quotation from which is set out in the opinion of the court); *Fairfield* v. *United States*, 146 Fed. 508 (8th Cir.).

In *Nelson* it is stated that: "The tendency or effect of the testimony on the issues between the parties is no concern of theirs [the witnesses']." This principle has been applied both in contempt proceedings where the witness

has disobeyed the court's order that he answer, as in the cases cited in the previous paragraph, and also at the earlier stage when the court rules on the application for the order to compel the witness to answer. *In re Ullman*, 128 F. Supp. 617, 628 (S.D.N.Y.) ; *New England Phonograph Co.* v. *National Phonograph Co.,* 148 Fed. 324 (C.C.D.N.J.). The application of this principle in the present case requires examination.

In some cases the witness has no independent right, but seeks to avoid the hardship and inconvenience of testifying, as in *Ex parte Blair*, 253 Fed. 800; *aff'd, Blair* v. *United States, supra.* Here the contention is different. The contention is that there is a privilege of a newsman not to reveal a confidential source of information unless it is of sufficient importance to the case to warrant the breach of confidence.[3] A conflict between this contention and the *Nelson* rule immediately appears. If deponent's sole contention were that he has an absolute privilege[4] there would be no conflict with the *Nelson* rule. But that is not the situation. Under the contention deponent is making, the tendency and effect of the testimony on the issues between the parties *is* of concern to the newsman witness.

Let us suppose that a defendant seeks by deposition to elicit that there is nothing to plaintiff's case, prelim-

---

[3]As stated in deponent's reply brief: "Fundamentally, deponent urges that in an inquisitorial examination under our discovery rules in which a party is attempting to obtain clues which may lead to evidence and where the court is given discretion to limit the scope of the examination, a newsman cannot be compelled to disclose a confidential source unless it clearly appears that the information sought is relevant and sufficiently important to a party's claim or defense as to warrant an abridgment of the freedom of the press resulting from the forced disclosure of the news sources."

[4]At the time of the taking of the deposition. deponent's claim appeared to be one of absolute privilege. Defendants' counsel at that time indicated that he had no objection to deponent's claim. Deponent then was not represented by counsel. As the case has developed, the contention is as stated in note 3.

inary to moving for summary judgment. The newsman witness is not satisfied with this procedure. He feels that he is being unnecessarily injured if forced to reveal confidential sources of information. He seeks to pinpoint the crucial issue. These are the very tactics which defendant had decided not to follow. Who is to prevail? If that question is to be argued it clearly cannot be done in the absence of defendant.

The present case is comparable to the hypothetical case just put. Deponent's real contention is that, as a newsman with confidential sources, he is being unnecessarily injured by the manner in which the parties are conducting their case.[5] Defendants, who themselves sought deponent's testimony in an apparent effort to show that there was nothing significant in this newsman's appearance with a photographer at the Civil Service Commission meeting at which plaintiff was discharged from her position, could hardly object to plaintiff's motion seeking to obtain an answer on cross-examination to the question who it was that gave him the confidential information that, among other things, caused him to attend the meeting. At all events, defendants' counsel seems to have taken a neutral position at the hearing of that motion. Deponent is in the position of asserting against both plaintiff and defendants that there is a resultant injustice to himself in the exploration they are conducting.

I do not see how this court can entertain the question which thus emerges when the defendants have not been brought before us but only the plaintiff. *Lord* v. *Lord,* 35 Haw. 10, is distinguishable. In that case demur-

---

[5]Deponent's argument that he should be discharged from any obligation to answer plaintiff's questions on the basis of surmise by this court that the so-called "confidential information" was nothing more than general talk about possible firing of plaintiff, originating in the apparent friction between plaintiff and members of the commission, is not tenable.

ring defendants were allowed to take an interlocutory appeal without serving the notice of appeal on other defendants who had answered without demurring. Here, however, the interlocutory appeal has been taken by one who does not himself have the rights of a party defendant. Under the circumstances, the most that this court could do would be to direct that the construction and legal effect of the pleadings be briefed and argued by plaintiff and defendants, with deponent participating as an interested bystander. *Cf., Simonin's Sons* v. *American Can Co.,* 30 F. Supp. 901 (E.D.Pa.), and *La Cotonniere de Moislains* v. *H. & B. American Machine Co.,* 19 F.R.D. 6 (D.Mass.), in which the litigants were the parties to the action.

In all but one of the cases cited by deponent, discovery was sought of a party or its officers and employees, and the difficulty with which we are confronted did not arise. In one case, *Shawmut, Inc.* v. *American Viscose Corp.,* 11 F.R.D. 562 (S.D.N.Y.), a motion under Rule 30(d) to limit the examination was made by a deponent who was not a party to the action though named therein as a coconspirator. This motion was made in the New York district in which the deposition was being taken. The action, however, was pending in the United States District Court for the District of Massachusetts, which already had ruled against a motion by the defendant in the action to exclude discovery of customer names obtained by that defendant from the person subsequently making the motion in New York. In the proceeding in New York it was held that the earlier ruling in Massachusetts was not binding on movant. This case is not a pattern for the procedure to be followed when, as here, the deposition is being taken where the action was brought.

In *City and County of San Francisco* v. *Superior Court,* 38 Cal.2d 156, 238 P.2d 581, also cited by de-

ponent, the question was whether plaintiff civil service employees could inspect data which the Civil Service Commission, one of the defendants, had obtained from private employers in confidence, and could not have obtained otherwise. By statute public officers were protected from examination as to communications made to them in official confidence when the public interest would suffer by the disclosure. This statute was applied, and the effect of the ruling on the salary schedule that had been adopted on the basis of this data was left to be determined later, the court saying: "What may be the relation of the agreements of confidence to the alleged cause of action or defense is not a matter for consideration at this time." We do not have here a statute such as was applicable there, and deponent cannot prevail on any such basis.

The opinion of the majority proceeds upon the assumption that the key fact is that which plaintiff asserts to be such. The same approach was taken in *Garland* v. *Torre*, 259 F.2d 545 (2d Cir.), where however information was sought as admissible evidence and not merely as a lead to evidence. In my view, this approach does not put the spotlight on the real difficulty in the present case. We can say that such privilege as deponent may have, at all events is dependent upon the circumstances, we can rule that the trial court did exercise the discretion possessed by it, but we cannot pass upon deponent's contention that "the interest to be served by compelling disclosure of the deponent's source of confidential information under the circumstances here present does not justify any impairment of press freedom" (specification of error No. 3), nor on his contention that there is an absence of "some even more compelling societal need," such as would justify the compulsion of the disclosure (specification of error No. 4).

Although, for the reasons stated, it is my view that

specifications of error Nos. 3 and 4 are not properly presented, still there are other specifications which present a question for review and the case therefore is not one in which a dismissal is called for. *R. W. Meyer, Ltd.* v. *McGuire,* 36 Haw. 184, 186. Accordingly, I concur in the result and join in the affirmance of the order appealed from.

DISSENTING OPINION OF MIZUHA, J.

The right of members of the press to remain silent as to confidential sources of news and to be free from compulsory testimony divulging such sources was not recognized under the English common law. However, James Madison, the proponent in the First Congress of the First Amendment, wrote that "the state of the press under the common law, cannot * * * be the standard of its freedom in the United States." (VI Writings of James Madison 1790-1802, 387),

The Supreme Court of the United States in the case of *Bridges* v. *California,* 314 U.S. 252, 256, 86 L.Ed. 192, 204, confirmed Madison's opinion and held that:

"No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed. * * * And since the same unequivocal language is used with respect to freedom of the press, it signifies a similar enlargement of that concept as well. * * * [T]he only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society."

Restraints against the freedom of press clause, applied at the stage of news dissemination, have been invalidated. *Near* v. *Minnesota,* 283 U.S. 697, 716, 75 L.Ed. 1357. Judicial protection of the press has prevented forced disclosure of the identity of those who distributed or sponsored handbills and booklets, *Talley* v. *California,* 362 U.S. 60, 64, 4 L.Ed.2d 559, and forced disclosure of identity at the last step of the news dissemination process—the purchaser of the books. *Rumely* v. *United States,* 197 F.2d 166, 174 (D.C. Cir. 1952), *aff'd on other grounds,* 345 U.S. 41.

Forced disclosure of certain relationships may interfere as effectively with the exercise of the First Amendment liberties as direct governmental restraints against such exercise. *Shelton* v. *Tucker,* 364 U.S. 479, 5 L.Ed.2d 231. The protection granted to the freedom of the press cannot be limited to any particular way of abridging it. *Near* v. *Minnesota, supra; Grosjean* v. *American Press Co.,* 297 U.S. 233, 249, 80 L.Ed. 660.

> "* * * [T]he fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes." *American Communications Assn., CIO* v. *Douds,* 339 U.S. 382, 402, 94 L.Ed. 925.

> "* * * [A]bridgement of such rights [of free speech, press and association], even though unintended, may inevitably follow from varied forms of governmental action." *N.A.A.C.P.* v. *Alabama,* 357 U.S. 449, 461. See also *Bates* v. *City of Little Rock,* 361 U.S. 516, 522-23 and *Watkins* v. *United States,* 354 U.S. 178, 197-99.

Recognizing the principle that the First Amendment

includes in its sweep the gathering of news, the Supreme Court of the United States in *Associated Press* v. *United States,* 326 U.S. 1, 89 L.Ed. 2013, stated:

> "That [the First] Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press* v. *United States, supra* at 20.

Not only does the Amendment constitute a "command that the government itself shall not impede the free flow of ideas" but also "affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity." *Id.* at 20.

> Mr. Justice Murphy in his dissent, stated:

> "Nor can we escape the fact that governmental action directly aimed at the methods or conditions of such collection or distribution is an interference with the press, however differing in degree it may be from governmental restraints ·on written or spoken utterances themselves." *Id.* at 51. See also *Associated Press* v. *KVOS,* 80 F.2d 575, *rev'd on jurisdictional grounds,* 299 U.S. 269.

News gathering and news dissemination are inseparable aspects of a single publishing process and should not be separable in law, if we are to give to liberty of the press "the broadest scope that could be countenanced in an orderly society." *Bridges* v. *California, supra* at 265. Writers of note have urged the protection and maintenance of the broad scope of the freedom of the press. The noted American author and reporter, Dorothy Thompson, has stated:

> "The suggestion that freedom of reporting can exclude access to facts is extremely dangerous doc-

trine. The gleaning of facts is essential to knowledge, without which the right to publish is empty—and its exercise irresponsible." Dorothy Thompson quoted by William O. Douglas in "The Right of the People" 81 (1958).

Dr. Wallace Parks in The George Washington Law Review:

"'* * * It is certainly reasonable to conclude that freedom of the press and speech under contemporary conditions includes the right to gather information from government agencies and stands as a constitutional prohibition against all forms of withholding information beyond that reasonably required for the exercise of delegated powers or the protection of other rights. In view of the fact that the general availability of government information is essential to the exercise of the role entrusted by the Constitution to voters, to 'free publics', and the Congress, it would appear that information can be withheld constitutionally only in particular situations when it is decided by competent authority not only that its release would affect adversely other rights or would interfere with the exercise of granted powers but also that on balance the over-all public interest requires withholding. * * *.'" Dr. Wallace Parks, 26 The George Washington Law Review 1, 12 (1957).

Siebert and Ryniker in the "Editor and Publisher":

"'News channels which prove valuable in unearthing such examples of public scandals remain so only as long as the source remains secret. Honest officials, and occasionally dishonest persons, who can furnish necessary information, cannot afford to jeopardize their freedom or their jobs by permitting their names to be used.

"'No community can afford to shut off these chan-

nels of information, and no honest newspaper can afford to keep its reporters in hourly fear of contempt charges. * * *.

" 'No information would be given if the informant did not have faith in the integrity of the reporter in the matter of withholding his name. The newspaper man would find his channels of news closed.' " Siebert and Ryniker, Editor and Publisher, September 1, 1934, pp. 36-37.

See also United Nations Economic & Social Council, Document E/2693 p. 25 (1955), Zechariah Chafee, Government and Mass Communications 497 (1947), 1949 Report of the Law Revision Commission, New York 26.

Whenever the Supreme Court of the United States has been called upon in the past to weigh First Amendment rights on the scales against other compelling rights, it has been fully cognizant of "the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment." *Thomas* v. *Collins*, 323 U.S. 516, 530.

" '* * * [W]e remain mindful of the fact that the latter [freedom of press and religion] occupy a preferred position.' " *Marsh* v. *Alabama*, 326 U.S. 501, 509, 90 L.Ed. 265, 270. But freedom of the press and other First Amendment rights, occupying this preferred position is not an absolute. *Konigsberg* v. *State Bar of California*, 366 U.S. 36, 6 L.Ed.2d 105, 117; *American Communications Assn., CIO* v. *Douds, supra* at 399.

The test as to when First Amendment freedoms can be rigidly circumscribed was laid down in the *Schenck* case where the Supreme Court of the United States said:

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Con-

gress has a right to prevent." *Schenck* v. *United States,* 249 U.S. 47, 52, 63 L.Ed. 470.

However great the likelihood that a substantive evil will result, restriction on fundamental rights cannot be sustained unless the evil itself is "relatively serious," *Whitney* v. *California,* 274 U.S. 357, 379, 71 L.Ed. 1095, (Brandeis, J., concurring), or "extremely serious and the degree of imminence extremely high," *Bridges* v. *California, supra* at 263, or "an imminent, * * * threat to the administration of justice." *Craig* v. *Harney,* 331 U.S. 367, 376.

> "Those cases [clear and present danger] do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' " *Bridges* v. *California, supra* at 263.

From the "clear and present danger" test on First Amendment freedoms, there has now evolved a "balancing" test. When particular conduct is regulated in the interest of public order and the regulation results in an indirect, conditional, partial abridgement of speech, the duty of the courts is to determine which of the two conflicting interests demands the greater protection under the particular circumstances presented. *American Communications Assn., CIO* v. *Douds, supra* at 382. "Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." *Barenblatt* v. *United States,* 360 U.S. 109, 126, 3 L.Ed. 2d 1115. "Whenever, * * * these constitutional protections [freedom of speech and association] are asserted

against the exercise of valid governmental powers a reconciliation must be effected and that perforce requires an appropriate weighing of the respective interests involved." *Konigsberg* v. *State Bar of California, supra* at 51.

The Supreme Court of the United States has frequently and consistently upheld the right of the public to be protected from evils of conduct, even though First Amendment rights of persons or groups are in some manner restricted and infringed. See *Kovacs* v. *Cooper,* 336 U.S. 77; *Cox* v. *New Hampshire,* 312 U.S. 569; *Prince* v. *Massachusetts,* 321 U.S. 158; *In re Summers,* 325 U.S. 561; *United Public Workers of America, CIO* v. *Mitchell,* 330 U.S. 75; *Giboney* v. *Empire Storage & Ice Co.,* 336 U.S. 490. As Mr. Chief Justice Hughes put it, "Civil liberties as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *Cox* v. *New Hampshire, supra* at 574.

The recent case of *Garland* v. *Torre,* 259 F.2d 545, *cert. denied,* 358 U.S. 910, 3 L.Ed.2d 231, illustrates the application of the "balancing" test, *i.e.,* the freedom of press guaranty against the infringement of that freedom by the forced disclosure of the reporter's confidential source of information. The United States Second Circuit Court of Appeals held that the compelled disclosure under the particular combination of facts was not such an infringement of the press freedom. However, the court accepted "the hypothesis that compulsory disclosure of a journalist's confidential sources of information may entail an abridgement of press freedom by imposing some limitation upon the availability of news." *Id.* at 548.

By Act of 5 Eliz., c. 9, § 12 (1562), provision was made for the service of process out of any English court

of record requiring the person served to testify or depose concerning any cause or matter pending in the court, and by the early Eighteenth Century it had become a "maxim that the public has a right to every man's evidence." 8 Wigmore, *Evidence,* §§ 2190-92, at 64 (3d ed. 1940). We have long recognized the obligation of a witness to testify. *Bennett* v. *Walker,* 23 Ill. 97, 101; *Dixon* v. *People of the State of Illinois,* 168 Ill. 179; *West* v. *State,* 1 Wis. 209, 253; *Blair* v. *United States,* 250 U.S. 273, 279-81, 63 L.Ed. 979. "* * * [O]ne of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned." *Blackmer* v. *United States,* 284 U.S. 421, 438, 76 L.Ed. 757.

This duty of the witness to testify in a court of law involves material sacrifice, and nearly always, invasion of personal privacy. The freedom to choose whether to speak or be silent disappears in a courtroom, and becomes a delicate task, especially when this right is based upon First Amendment freedoms of the witness. When personal sacrifice is involved it "is a part of the necessary contribution of the individual to the welfare of the public." *Blair* v. *United States, supra* at 281. The duty to testify would be meaningless unless there is power to compel testimony. Judicial compulsion of testimony with the power to fine or imprison for disobedience, has been accepted as part of the basic concept of the judicial power in the United States. *People ex rel. Phelps* v. *Fancher,* 2 Hun. 226, (N.Y. Sup. Ct. 1874); *Blair* v. *United States, supra* at 279-81; *Blackmer* v. *United States, supra* at 438; *Wilson* v. *United States,* 221 U.S. 361, 372-73, 55 L.Ed. 771. The right of a litigant to secure judicial compulsion of testimony in civil suits under a procedural rule as 26(b), H.R.C.P. is standard procedure in the federal courts. *General Motors Corp.* v. *California Research Corp.,*

9 F.R.D. 568; *E. I. Du Pont De Nemours & Co.* v. *Phillips Petroleum Co.*, 24 F.R.D. 416; *Grogan* v. *Pennsylvania R.R.*, 11 F.R.D. 186; *Hornung* v. *Eastern Auto. Forwarding Co.*, 11 F.R.D. 300.

In the instant case, what must be determined is whether the interest to be served by compelling the testimony of newspaper reporter Goodfader justifies an impairment of this First Amendment freedom of the press.

The problem is one of balancing and weighing the probable effects of the order of the lower court upon this First Amendment freedom against a procedural rule in discovery examination. A great part of the news, particularly political news of wide public concern is, for perfectly proper reasons, communicated to reporters on condition that the source not be disclosed. The instant case is of such public concern as it deals with the future status of the director of the Civil Service Commission. Refusal of the condition means refusal of the information. To the extent that judicial compulsion under a procedural rule[1] which sanctions a "fishing expedition" renders such assurance to informants unavailable or precarious, the flow of news to the public is pinched off at its source and, *pro tanto* the public's right to know is diminished.

> "* * * [T]he delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

---

[1]H.R.C.P., Rule 26(b). *Scope of Examination.* Unless otherwise ordered by the court as provided by Rule 30(b) or (d), the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the examining party or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of relevant facts. It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence.

*Schneider* v. *State,* 308 U.S. 147, 161, 84 L.Ed. 155; *American Communications Assn., CIO* v. *Douds, supra* at 400.

In *Garland* v. *Torre, supra,* appellants contended that in a discovery proceeding an order to compel the newspaper reporter to disclose a confidential source of news did encroach upon the freedom of the press guaranteed by the First Amendment because " 'it would impose an important practical restraint on the flow of news from news sources to news media and would thus diminish *pro tanto* the flow of news to the public.' " *Garland* v. *Torre, supra* at 547.

The Second Circuit Court of Appeals recognized in *Garland* v. *Torre, supra,* that the freedom of the press as raised in the case "must give place under the Constitution to a paramount public interest in the fair administration of justice" and that it was not dealing "with a case where the identity of the news source is of doubtful relevance or materiality. * * * The question asked of the appellant went to the heart of the plaintiff's claim. We hold that the Constitution conferred no right to refuse an answer." *Id.* at 549. For relevancy of questions asked on qualification of bar applicant, see *Konigsberg* v. *State Bar of California, supra;* for non-relevancy of membership lists requested on whether foreign corporation is engaged in intrastate business, see *N.A.A.C.P.* v. *Alabama, supra* at 464. For pertinency of questions asked in aid of the legislative process, see *Barenblatt* v. *United States, supra* at 127; for nonpertinency of questions asked in aid of legislative process, see *Watkins* v. *United States, supra* at 215.

The *Garland* case arose from a suit by Judy Garland against Columbia Broadcasting System, Inc. in which she alleged that the defendant had made "false and defamatory" statements about her and had "authorized, request-

ed and induced" the publication in newspapers and else-where. As an alleged example of such a publication, Miss Garland annexed as an exhibit to her complaint a few paragraphs of a column entitled "TV-Radio Today" written by Marie Torre and published in the New York Herald Tribune on January 10, 1957. In her deposition Miss Torre testified that the statements appearing in the column were in "exact words" statements which had been made to her over the telephone by a CBS informant. The information sought from Miss Torre was the name of this CBS informant and was vital to the successful prosecution of her complaint.

That portion of the testimony of the appellant which formed the basis of the lower court's order appears in the margin below.[2]

The name of the informant who stated to the appellant "that there might be an attempt to fire Mrs. Gallas" is not only irrelevant and immaterial but also is inadmissible hearsay and relates to the speculation of an un-

---

[2] "Q—You stated that about a week and a half before the December 16th meeting that there might be an attempt to fire Mrs. Gallas. Is that correct?

A—That's right.

Q—Where did you hear that?

A—I'm not at liberty to divulge my source of information.

Q—Did someone tell you about it?

A—It would be a very grievous breach of my professional ethics for me to say anything which might lead back to my source.

Q—In other words, you refuse to state who told you about it?

A—(Witness nodded head in affirmative motion.) I refuse to say how I got the information.

Q—And you refuse to state where that information was given to you?

A—(Witness nodded head in affirmative motion.)

Q—Do you also refuse to say who gave this information to you?

A—(Witness nodded head in affirmative motion.)

Q—After you got that information, you did some checking on that information. Is that correct?

A—I did, yes.

Q—In your checking, did you discover any leads to substantiate that?

A—Nothing definite. I became convinced circumstantial—which was merely circumstantial evidence, that there was some truth to it. I also became convinced that Mrs. Gallas knew nothing of it. . . ." (R. Vol. 1, pp. 569-570.)

disclosed third party as to what might happen to Mrs. Gallas, the plaintiff. Furthermore, appellant, upon checking that information, found nothing to substantiate this information but became convinced by circumstantial evidence that there was some truth to it.

We are involved here with the determination as to whether the demands of press freedom are considerably more substantial than in the *Garland* case in order to outweigh the right of a litigant to judicial compulsion of testimony.

First, the information sought in the *Garland* case related to the affairs of private parties, an action against Columbia Broadcasting System, Inc. (CBS) by Judy Garland "for allegedly false and defamatory statements allegedly made concerning her by a 'network executive' of the broadcasting system * * *." *Garland* v. *Torre, supra* at 545. Here, the desired information concerns the administration of the Civil Service Commission of the City and County of Honolulu. News about the affairs of private parties may not be sufficiently important to outweigh the compelling interest of a litigant to enlist judicial compulsion of testimony. However, the gathering of news relating to the administration of government is sufficiently important to require judicial protection in order to preserve the right of the people to full information regarding the acts or omissions of public servants in order to guard against maladministration or oppression of the government.

This interest of the public in being kept fully informed on day-to-day governmental affairs completely overshadows in importance the interest of private parties who desire to enlist judicial compulsion of testimony for private litigation.

Second, the information sought in the *Garland* case "went to the heart of the plaintiff's claim." Here, the

order which compelled disclosure of the confidential news source was of doubtful relevance or materiality. See *Garland* v. *Torre, supra* at 545; *Rosenberg* v. *Carroll,* 99 F. Supp. 629. The remote interest of the plaintiff in a private suit under a procedural rule which states "that it is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appear reasonably calculated to lead to the discovery of admissible evidence" does not justify an infringement upon so basic a constitutional guaranty as the freedom of the press. The right of a litigant in private suits to secure compulsion of testimony as an incident of the judicial power of the United States does not justify an impairment of this First Amendment freedom on the grounds that it is legitimate "fishing expedition" under Rule 26(b), H.R.C.P.

Clearly, the answer sought by the plaintiff below was relevant to its inquiry only if it were one of the defendants who had supplied the information. In the *Garland* case, *supra,* the newspaper article attributed to a CBS "network executive" the several statements which the complaint alleged were false, defamatory and highly damaging to the plaintiff's professional reputation. In deposition taken by plaintiff's counsel of executives of CBS, each denied making the statements in question. Here, defendants Moniz and Watanabe affirmatively allege in their amended answer that they had no prior knowledge of the move to discharge plaintiff. Defendant Pedro Sanchez, Chairman of the Civil Service Commission in his deposition states that the persons with whom he discussed or those who were aware of his statement of dismissal which he began preparing on December 10, 1957, were his wife and Mayor Blaisdell. Earlier in his deposition, appellant had stated: "I questioned three Commissioners at the Wednesday meeting preceding the one at

which Mrs. Gallas was fired. All of them denied knowledge of any such attempt. However, it seemed to me there must be something in it from the replies I got. That was the impression I got at the time." It is apparent that the confidential information sought by the plaintiff did not originate from the three defendants. The lower court in its order to compel disclosure stated: "In plaintiff's case under all circumstances, it would appear that it is very likely to lead to something of extreme value to their case and that is one of the basic functions of discovery, to seek leads. For that reason, this outweighs the other consideration." The lower court, considered this problem on the ground that the sole question before the court was whether or not the deponent was protected by an evidentiary privilege and finding none, that Rule 26(b), H.R.C.P. applied.

In failing to consider the constitutional problem—the fundamental right of freedom of the press—the lower court, before making its order, was unable to exercise its discretion, and invoke Rule 30(d), H.R.C.P.[3] which appears in the margin below.

The problematical interest of the plaintiff in this case does not outweigh the vitally important constitutional

[3]H.R.C.P., Rule 30(d). *Motion To Terminate Or Limit Examination.* At any time during the taking of the deposition, on motion of any party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the circuit where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in subdivision (b). If the order made terminates the examination, it shall be resumed thereafter only upon the order of the court in which the action is pending. Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order. In granting or refusing such order the court may impose upon either party or upon the witness the requirement to pay such costs or expenses as the court may deem reasonable.

and public policy consideration involved in the preservation of news gathering sources of our newspapers.

In all these cases where the courts have ordered the disclosure of confidential news sources, there was a much stronger public interest in both the subject matter of the litigation (libel and criminal libel) and disclosure of the information (grand jury, court and disbarment proceedings) sought, than the public interest in protecting confidential news sources. See *Clein* v. *State,* 52 So. 2d 117 (Fla. 1951); *Plunkett* v. *Hamilton,* 136 Ga. 72, 70 S.E. 781; *Matter of Wayne,* 4 U.S.D.C. Hawaii 475; *Brewster* v. *Boston Herald-Traveler Corp.,* 20 F.R.D. 416 (D. Mass. 1957); *Pledger* v. *State,* 77 Ga. 242, 3 S.E. 320; *Ex Parte Holliway,* 272 Mo. 108, 199 S.W. 412; *People ex rel. Phelps* v. *Fancher,* 2 Hun. 226 (N.Y. Sup. Ct. 1874); *People ex rel. Mooney* v. *Sheriff of New York County,* 269 N.Y. 291, 199 N.E. 415; *Vi Murphy* v. *Colorado, cert. denied,* 365 U.S. 843[4].

In *Vi Murphy* v. *Colorado, supra,* a disbarment proceeding against attorney John H. Gately, the State was attempting to prove that Gately's actions in filing a petition in the Colorado Supreme Court containing highly defamatory accusations against a former chief justice of the court, and in causing the contents to be published, were malicious and for the purpose of obtaining publicity for himself. The newspaper reporter, Mrs. Vi Murphy, who had written the news article, refused to answer the supreme court's questions as to whether she had received from Gately a copy of the petition before it was filed. The information was essential to establishing Gately's motives in filing the petition. The information sought was relevant and material, and essential to the State's case against Gately. Compelling the witness to answer the

---

[4]Unreported Colorado case mentioned in the opinion of the court.

questions under these circumstances justified some infringement upon the freedom of the press.

With the exception of *Vi Murphy* v. *Colorado, supra,* no state court has ever before ordered forced disclosure of news sources after weighing the claim that the guaranty of the First Amendment freedom of the press forbids such disclosure. In none of the state cases has the judicial power of the court been used to force disclosure of a news source in a discovery proceeding to support a "fishing expedition" that appeared to the trial court "very likely to lead to something of extreme value to their case," where the news had to do with the executive administration of government, and where the information sought was irrelevant and immaterial and inadmissible as hearsay.

There is no case in the federal court, with the exception of *Garland* v. *Torre, supra,* which compelled disclosure on the basis that the identity of the news source was relevant and material, and that the question asked "went to the heart of the plaintiff's claim." But the Court of Appeals for the Second Circuit recognized that the type of disclosure sought may infringe on the freedom of the press. Here, compulsion of disclosure results in an indirect censorship on the confidential news sources of newspaper reporters, and does result in an abridgement of press freedom by imposing a definite limitation upon the availability of news. The right of the plaintiff to judicial compulsion of testimony on so meager an interest as may be argumentatively found in the remote possibility that the disclosure of the news source may lead to admissible evidence, must give place under the Constitution in the public interest to a free press which "stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves." *Grosjean* v. *American Press Co., supra* at 250.